**William Henry HANCE, Petitioner,**

v.

**Walter D. ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent.**

**No. 82–8342.**

United States Court of Appeals, Eleventh Circuit.

Jan. 24, 1983.

---

Leonard M. Marks, Howard Lloyd Wieder, Gold, Farrell & Marks, John Charles Boger, New York City, for petitioner.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent.

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD *, District Judge.

JOHNSON, Circuit Judge:

Petitioner William Henry Hance was convicted by a jury in the Superior Court of Muscogee County, Georgia, of the murder of Brenda Gail Faison (a/k/a Gail Jackson) and of attempted theft by extortion. The jury sentenced him to death for the murder under Ga.Code Ann. § 27–2534.1(b)(7) and he was sentenced to five years' imprisonment for attempted extortion.

The Supreme Court of Georgia affirmed the convictions and sentences. *Hance v. State*, 245 Ga. 856, 268 S.E.2d 339, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 611 (1980), *reh'g denied*, 449 U.S. 1135, 101 S.Ct. 958, 67 L.Ed.2d 122 (1981). Hance's petition for habeas corpus was dismissed by the Superior Court of Butts County, Georgia, after a hearing. The Supreme Court of Georgia denied petitioner's application for a certificate of probable cause and the United States Supreme Court denied certiorari. *Hance v. Zant*, —— U.S. ——, 102 S.Ct. 2046, 72 L.Ed.2d 491 (1982).

The United States District Court for the Middle District of Georgia granted petitioner leave to proceed *in forma pauperis* and summarily denied his application for habeas corpus without an evidentiary hearing. The court denied a stay of execution pending appeal but granted a certificate of probable cause to appeal to this Court. This Court granted a stay of execution pending appeal.

On or about February 28, 1978, Hance, a soldier at Fort Benning in Columbus, Georgia, killed prostitute Gail Jackson, after she propositioned him, by knocking her unconscious with a karate chop and then repeatedly striking her in the face with a jack handle. On March 15, Hance killed prostitute Irene Thirkield in a similar manner, leaving her body on Fort Benning grounds.

Between March 3 and April 5, Hance sent five letters to Columbus Police Chief McClung and one letter to the local newspaper claiming that "The Forces of Evil", a white organization, had kidnapped Gail Jackson and Irene, who were black, in order to pressure the Columbus police to capture the "stocking strangler" who was then terrorizing the white women of the city. The handprinted letters on Army stationery threatened that, if the strangler was not caught by June 1, 1978, or if $10,000 was not given to "The Forces of Evil", Gail Jackson would be killed and other black female victims would follow.

On March 30, 1978, Hance, claiming to be "The Forces of Evil", telephoned the Fort Benning military police and the Columbus Police Department, indicating that Gail Jackson's body could be found a certain metric distance from the Sand Hill Bar. The military police and the police receptionist who received the calls thought the caller was a young black male. Gail Jackson's body was found at the specified location covered with twigs and leaves. Her face was mutilated. Near the body was found an Army cap with a different unit insignia than Hance's unit. On April 3 the Fort Benning desk sergeant received a call from "The Forces of Evil" indicating where on Fort Benning Irene's body could be found. The caller sounded like a black male.

Irene Thirkield was last seen on March 15, talking to a soldier in Vice Mitchell's Tavern. One of the witnesses told Agent Richard Fox, of the United States Army Central Intelligence Division ("C.I.D."), that Hance was the soldier seen with the victim and stated that the two left the tavern together. Tape recordings of the phone calls to the Fort Benning police which indicated where the bodies could be found were taken by C.I.D. Agent Besson to Hance's company commander and first sergeant, who thought it was Hance's voice on the tapes.

On April 4, 1978, Agents Besson and Fox told the petitioner's commanding officer

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

that they wanted to interview Hance. Hance agreed to be taken to C.I.D. headquarters, where he was advised of his rights by Agent Fox and informed that the interview concerned the murder of Irene Thirkield, with whom he was the last person seen. Hance signed a waiver of his rights. The interview was conducted from about 1:00 p.m. until 10:20 p.m. Hance was then interviewed by the FBI and the Columbus police for another hour. During the interviews Hance admitted writing letters and making the telephone calls for "The Forces of Evil" but said he had been forced to do so by the organization. The next morning, at about eight, Hance was again advised of his rights, which he again waived. He was interviewed until about 3:15 p.m. when he signed a written statement concerning each murder. Throughout the two days of interrogation he was given breaks to eat and to use the restroom. Hance was also given coffee and allowed to smoke. At no time did petitioner request a lawyer or ask that the interview be terminated.

# I. STANDARD OF REVIEW

The standard of review for habeas corpus petitions by prisoners in state custody is set out in 28 U.S.C.A. § 2254(d).[1] A written determination after a hearing on the merits of a factual issue, made by a state trial or appellate court of competent jurisdiction, is presumed to be correct unless one of the conditions set forth in Section 2254(d)(1)–(7) is found to exist. If none of these conditions is found, or unless the state-court determination is "not fairly supported by the record," 28 U.S.C.A. § 2254(d)(8), the petitioner must establish by convincing evidence that the factual determination by the state court was erroneous. *Sumner v. Mata,* 449 U.S. 539, 546, 550, 101 S.Ct. 764, 768, 770, 66 L.Ed.2d 722 (1981). This presumption of correctness does not apply to legal findings or to mixed questions of law and fact. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). Factual issues involve "what are termed basic, primary, or historical facts: facts 'in the sense of a

1. 28 U.S.C.A. § 2254(d) provides that:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

recital of external events and the credibility of their narrators ....'" *Townsend v. Sain,* 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963), *quoting Brown v. Allen,* 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953) (opinion of Frankfurter, J.). On the other hand, mixed questions of law and fact involve "the application of legal principles to the historical facts of [the] case." *Cuyler, supra,* 446 U.S. at 342, 100 S.Ct. at 1714. As Justice Frankfurter once stated: "Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts ... the [Federal] Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." *Brown, supra,* 344 U.S. at 507, 73 S.Ct. at 446 (opinion of Frankfurter, J.).

## II. FRUIT OF AN ILLEGAL ARREST

■ Petitioner's first argument on appeal is that his confessions must be excluded under *Taylor v. Alabama,* —— U.S. ——, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), as the impermissible fruit of a warrantless arrest without probable cause. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Because Hance was afforded the opportunity for full and fair litigation of this Fourth Amendment claim in state court, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), precludes its consideration in a federal habeas corpus proceeding. *Williams v. Brown,* 609 F.2d 216, 220 (5th Cir.1980); *Caver v. Alabama,* 577 F.2d 1188, 1191–94 (5th Cir.1978).

## III. ACCESS TO AN ATTORNEY

■ While Hance was being interrogated, attorney David Clark, who had not yet been retained by petitioner, was attempting to locate him to advise him of his rights. Hance argues that the confessions resulting from his interrogation should be excluded under *Escobedo v. Illinois,* 378 U.S. 478, 486–87, 490–91, 84 S.Ct. 1758, 1762–63, 1764–65, 12 L.Ed.2d 977 (1964), and *Miranda v. Arizona,* 384 U.S. 436, 465 n. 35, 86 S.Ct. 1602, 1623 n. 35, 16 L.Ed.2d 694 (1966), because law enforcement officials prevented his attorney from advising him, thereby violating his Fifth, Sixth and Fourteenth Amendment rights. But Hance never requested an attorney and Mr. Clark was never refused access to him. Given this situation, as found by the state trial court during a *Jackson v. Denno* hearing, *Escobedo* does not apply. *Love v. Alabama,* 411 F.2d 558, 560 (5th Cir.1969). Moreover, Hance was advised of his Fifth and Sixth Amendment rights and he signed a written waiver of those rights. Our determination whether this waiver was valid involves a mixed question of law and fact. *See Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977). Under the proper constitutional standard, the state must prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).[2] The trial court found by a preponderance of the evidence that Hance was properly advised of his rights, that he understood those rights, and that he voluntarily signed a written waiver of those rights. Implicit in this finding is the factual determination that Hance was mentally competent to waive his rights. Upon examination of the entire record, according a presumption of correctness to the factual findings of the state court, we conclude that Hance voluntarily and validly waived his right to counsel. *See Jurek v. Estelle,* 623 F.2d 929, 931–32 (5th Cir.1980) (en banc), *cert. denied,*

**2.** "The determination of whether there has been an intelligent waiver ... must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst, supra,* 304 U.S. at 464, 58 S.Ct. at 1023.

450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

## IV. COMPETENCY TO STAND TRIAL—NEED FOR A HEARING

■■■ Trial of a criminal defendant while he is mentally incompetent violates due process. *Nathaniel v. Estelle,* 493 F.2d 794, 796 (5th Cir.1974). The test for competency to stand trial is: whether the defendant "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States,* 362 U.S. 402, 402, 80 S.Ct. 788, 789, 4 L.Ed.2d 824 (1960) (per curiam). When a court has a "bona fide doubt" as to the defendant's competence, it must *sua sponte* conduct a hearing on his competency to stand trial. *Pate v. Robinson,* 383 U.S. 375, 385, 387, 86 S.Ct. 836, 842, 843, 15 L.Ed.2d 815 (1966); *Scarborough v. United States,* 683 F.2d 1323, 1324 (11th Cir.1982); *Zapata v. Estelle,* 588 F.2d 1017, 1020 (5th Cir.1979). This procedural guarantee, known as a *"Pate* hearing", protects the defendant's substantive constitutional right to a fair trial. *Pate, supra,* 383 U.S. at 385, 86 S.Ct. at 842; *Acosta v. Turner,* 666 F.2d 949, 954 (5th Cir. Unit B 1982). If the trial court ignores a bona fide doubt as to the defendant's competency,[3] *Pate* requires a *nunc pro tunc* competency hearing as long as a meaningful inquiry into the defendant's competency can still be made. *Zapata v. Estelle, supra,* 588 F.2d at 1020. If such a meaningful inquiry is no longer possible, the defendant must be retried, if found competent, or released. *Id.* Three factors should be considered in determining whether a *Pate* violation has occurred: (1) evidence of the defendant's irrational behavior; (2) his demeanor at trial; and (3) any prior medical opinion on his competence to stand trial. *Drope v. Missouri,* 420 U.S. 162, 180, 95 S.Ct. 896, 908, 43 L.Ed.2d 103

(1975). In any case, a *Pate* analysis must focus on what the trial court did in light of what it then knew. *Reese v. Wainwright, supra,* 600 F.2d at 1091.

■■■ Counsel for petitioner argues that the trial court's failure to conduct a competency hearing was a *Pate* violation because substantial evidence before the court suggested Hance's mental incompetence. He contends that Hance's letters from "The Forces of Evil" were replete with ravings and that the gruesome manner in which the prostitutes were slaughtered revealed a wholly abnormal mind. Petitioner's counsel also points out that the trial court was informed by counsel that a clinical psychologist's report "suggested that there may be some character disorder that might be further examined to determine Mr. Hance's present mental status." And it is argued that Hance's performance as his own lead counsel clearly indicated his mental incompetency.

After examination of the trial record in light of the three factors listed in *Drope,* we are convinced that the trial court's failure to *sua sponte* conduct a competency hearing was not a *Pate* violation. Aside from the manner in which Hance murdered the prostitutes, there was scant evidence before the trial court that Hance had a history of irrational behavior. Even the letters from "The Forces of Evil" lack significant probative value with regard to Hance's mental competency. Rather than indicating mental incompetency, they could as easily be interpreted to be evidence that Hance was aware of the consequences of his actions and had formulated a rational, albeit immature, plan of deception. Although the gruesome method of the murders is evidence of irrational behavior, Hance did not present the trial court with a history of irrational behavior comparable to that uncovered in *Pate v. Robinson* or in Fifth Circuit cases which have required a *Pate* hearing.[4] Evi-

---

**3.** A *Pate* violation may occur only in the time frame encompassed by the trial itself and immediately related proceedings. *Reese v. Wainwright,* 600 F.2d 1085, 1093 (5th Cir.), *cert.*

denied, 444 U.S. 983, 100 S.Ct. 487, 62 L.Ed.2d 410 (1979).

**4.** In *Pate, supra,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815, the defendant had a long history

dence of Hance's irrational behavior does not reach the level presented in some Fifth Circuit cases finding no *Pate* violation.[5]

There is little evidence in the trial record that Hance's demeanor suggested mental incompetence, and the issue of his competency was not raised. Although a criminal defendant cannot waive his right to a *Pate* hearing, this Court has found "the failure of defendant or his counsel to raise the competency issue persuasive evidence that no *Pate* violation occurred." *Reese v. Wainwright, supra,* 600 F.2d at 1092. The trial judge is only required to act reasonably on the facts before him. *Id.* Among the facts before the trial judge in this case was a psychological evaluation of petitioner that was made at Central State Hospital. It reported that Hance may be suffering from "long-standing feelings of inadequacy, inferiority, and insecurity." But the report concluded that

> there are ... no convincing indicators to suggest that this individual is psychotic at the present time or has ever been out of contact with reality in the past. Mr. Hance is aware of the charges against him, he has an understanding of basic courtroom procedure, and it is our opinion that he can communicate adequately with an attorney in the preparation of his defense. Therefore, we consider him to be competent for trial at the present time.

Given the facts before the trial judge, we cannot fault his failure to conduct a *sua sponte* competency hearing.

### V. COMPETENCY TO CONDUCT HIS OWN DEFENSE

▇ During the pretrial hearing, Hance requested that he be allowed to participate as lead counsel and handle the primary body of the proceedings. In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Supreme Court held that a criminal defendant has a constitutional right to manage his own defense when he "knowingly and intelligently" chooses to do so. *Id.* at 835, 95 S.Ct. at 2541. Assertion of the right of self-representation entails a waiver of the right to counsel. *Brown v. Wainwright,* 665 F.2d 607, 610 (5th Cir.1982) (former Fifth en banc). Because an accused who conducts his own defense thereby relinquishes many of the important benefits associated with the right to counsel, a trial judge must conduct a waiver hearing to make sure that the accused understands the dangers and disadvantages of proceeding *pro se. United States v. Chaney,* 662 F.2d 1148, 1152 (5th Cir. Unit B 1981). The record must establish that the defendant " 'knows what he is doing and his choice is made with eyes open.' " *Faretta, supra,* 422 U.S. at 835, 95 S.Ct. at 2541, *quoting Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942).

▇ Here the trial court conducted a waiver hearing, explaining many of the disadvantages that Hance would face by giving up his right to counsel and inquiring whether Hance understood that he could be executed for his alleged offense. Relying on Hance's responses during this colloquy, the trial court concluded, and we agree, that Hance was made aware of and knowingly relinquished his right to counsel. Although he was clearly not a competent attorney, Hance was competent to exercise

---

of disturbed and deranged behavior. He imagined hearing threatening voices, he had visions of snakes and elephants, and he often walked about in a complete daze. *Id.* at 380, 86 S.Ct. at 839. In *Lee v. State of Alabama,* 386 F.2d 97 (5th Cir.1967) (en banc), a lunacy commission had found the defendant insane less than four months before his trial because his feelings and emotions were governed by delusions of grandeur and of persecution. *Id.* at 99. In *Acosta v. Turner, supra,* 666 F.2d 949, defendant, after commitment to a mental hospital for more than

18 months, was diagnosed as still suffering from paranoid schizophrenia.

5. In *Jackson v. Caldwell,* 461 F.2d 682 (5th Cir.), *cert. denied,* 409 U.S. 991, 93 S.Ct. 334, 34 L.Ed.2d 257 (1972), no *Pate* violation was found although the defendant was mentally retarded, had previously been discharged from the army because of mental illness, and was subject to schizophrenic fits of anger and paranoia. He had bludgeoned his wife to death, buried her in a field, and planted peas in the field.

the right to defend himself. *See Faretta, supra,* 422 U.S. at 836, 95 S.Ct. at 2541.[6]

## VI. EFFECTIVE ASSISTANCE OF COUNSEL

Petitioner claims that he was denied his constitutional right to counsel "reasonably likely to render and reasonably rendering effective assistance." *Baty v. Balkcom,* 661 F.2d 391, 394 (5th Cir. Unit B 1981), *cert. denied,* ── U.S. ──, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). But Hance, by asserting his right to self-representation, had waived his right to counsel. A defendant who chooses to represent himself cannot later complain that the management of his own defense amounted to a denial of effective assistance of counsel. *Faretta, supra,* 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46.

Petitioner relies on *United States v. Fessel,* 531 F.2d 1275 (5th Cir.1976), in which the defendant asserted his right to defend himself shortly after the trial commenced and reversed his conviction on the grounds of ineffective assistance of counsel. That case is inapposite. In *Fessel,* the defendant's court-appointed counsel had disregarded the defendant's repeated requests before trial to subpoena psychiatric information necessary for the preparation of an insanity defense—the defendant's only possible defense. After asserting his right to represent himself, defendant Fessel moved for a continuance so that he could subpoena psychiatric information and prepare a defense. His request was denied and he was convicted. *Id.* at 1277–78. Fessel claimed that the ineffective assistance of counsel *before* he asserted his right of self-representation prevented the preparation and presentation of an adequate defense. Fessel did not challenge the effectiveness of

counsel after he assumed his own defense. *See id.* at 1278–79. Hance's claim of ineffective assistance, on the other hand, concerns only the performance of his standby counsel after Hance asserted the right of self-representation.

## VII. PROSECUTORIAL MISCONDUCT

To prevail on his claim of prosecutorial misconduct in this state habeas case, Hance must show that the prosecutor's actions were so egregious as to render the trial fundamentally unfair. *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Cobb v. Wainwright,* 609 F.2d 754, 756 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980). The asserted error must be one of constitutional magnitude. *Houston v. Estelle,* 569 F.2d 372, 377–78 n. 8 (5th Cir.1978). This determination should be made by considering the totality of the circumstances; the prosecutor's conduct should be evaluated in the context of the entire trial. *Id.* at 377.[7]

Capital murder trials in Georgia involve a bifurcated procedure. After the jury has found the defendant guilty, a sentencing hearing is conducted during which the jury must determine whether any mitigating or statutory circumstances exist, and if a statutory aggravating circumstance is found the jury must decide whether to recommend death or "mercy" (life imprisonment) for the defendant. Ga.Code Ann. §§ 26–3102, 27–2503(b) (1976). If the trial court is reversed because of error only in the sentencing phase, the new trial which may be ordered applies only to the issue of punishment. *Miller v. State,* 237 Ga. 557, 229 S.E.2d 376, 377 (1976); Ga.Code Ann. § 17–10–2(d) (1982). With this in mind, we examine the guilt-innocence phase and the sentencing phase separately.

---

6. In order to assist the defendant and move the proceedings along, the court directed the public defender to act as "standby counsel", subject to Hance's instructions. *See Faretta,* 422 U.S. at 834–35 n. 46, 95 S.Ct. at 2541 n. 46.

7. Several factors should be considered in evaluating prosecutorial misconduct in a habeas case: (1) the degree to which the challenged remarks have a tendency to mislead the jury

and to prejudice the accused; (2) whether they are isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and, except in the sentencing phase of capital murder trials, (4) the strength of the competent proof to establish the guilt of the accused. *See United States v. Leon,* 534 F.2d 667, 679 (6th Cir.1976).

During the guilt phase of the trial the prosecutor lived up to his promise to portray the crime in "vivid detail." After presenting numerous photographs of Gail Jackson's mutilated and largely decomposed body, the prosecutor introduced fragments of her corpse. During closing argument he reminded the jury that "[near the place of the murder] were found pieces of jawbone with the teeth attached, fragments of human skull no larger than a dime, individual teeth, and you'll have that with you to take out in evidence." This evidence was unquestionably inflammatory, but it depicted the scene of the crime and was relevant to the state's theory of the murder weapon, so under Georgia law it was admissible. *Cape v. State,* 246 Ga. 520, 272 S.E.2d 487, 491 (1980), *cert. denied,* 449 U.S. 1134, 101 S.Ct. 956, 67 L.Ed.2d 121 (1981); *Green v. State,* 242 Ga. 261, 249 S.E.2d 1, 6–7 (1978), *rev'd on other grounds,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979).

More troublesome is the manner in which the prosecutor expressed his personal opinion to the jury. After arguing that the case turned on the question of credibility he proceeded to vouch for the credibility of the state's witnesses. Referring to the C.I.D., the prosecutor said, "thank God for them, I might add, and for the Columbus Police Department, too. I'll sleep better tonight and I feel that each of you will too, because of the work they did in this case. . . ."[8] In reference to one of the state's witnesses he stated that "[h]er testimony had what we classify or call, as the ring of truth about it."[9] Citing his three years with the FBI, his eight years as a prosecutor, and his community roots, the prosecutor acted as an unsworn expert witness for the state when he explained to the jury why people generally confess: "And my years in law enforcement and in prosecution have taught me this, that confession as opposed to being an unnatural act, something that someone would not do, is a natural act."[10]

Certainly, the prosecutor's conduct during the guilt phase of this trial was improper, but it was not unconstitutional. Considering the overwhelming strength of the state's case we cannot find that the prosecutor's conduct rendered the determination of Hance's guilt fundamentally unfair. *See Cobb v. Wainwright, supra,* 609 F.2d at 755–56.

The sentencing phase of a capital murder trial in Georgia presents a different situation than the guilt phase. Even if the state proves the existence of statutory aggravating circumstances by conclusive evidence, the jury is instructed that they may recommend mercy. They have the choice of returning a life sentence. Ga.Code Ann. § 27–2503(b) (1976). Therefore, as recognized by the State of Georgia, it is most important that the sentencing phase of the trial not be influenced by passion, prejudice, or any other arbitrary factor. *See* Ga.Code Ann. § 27–2537(c)(1) (1976). With a man's life at stake, a prosecutor should not play on the passions of the jury.

In this case, the prosecutor's fervent appeal to the fears and emotions of an already aroused jury was error of constitutional dimension. The prosecutor started out the sentencing hearing by assuring the jury of the wisdom of their verdict, stating that he "had the advantage of sincerely and objectively knowing the evidence, believing that we would be at this stage of the trial at some point this week." He pointed out the magnitude of this crime by informing the jury, "I've been with the District Attorney's Office for a little over eight years now and it's my recollection that we've had

---

**8.** Such "emphatic and personalized vouching" for the integrity of the police was considered reversible error in *United States v. Ludwig,* 508 F.2d 140, 143 (10th Cir.1974).

**9.** In *United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978), the former Fifth Circuit Court stated that "[a]n attorney may not express his own opinion as to the credibility of witnesses."

**10.** The prosecutor also made several objectionable remarks about petitioner's character, implying that he was an "animal" and alluding to the fact that he had fathered an illegitimate child.

no more than a dozen times, no more than twelve times in those eight years, to request [the death penalty] out of the thousands of cases ... that pass through our office."[11] Gradually, the prosecutor began to stir up the fears of the jury: "I'm going to sleep well tonight, having [recommended Hance's electrocution] to you. As a matter of fact, I'm going to sleep better and safer in my home with my family if you come back with a sentence of death." He tried to convince the jury that no one could feel safe with Hance in prison, close to one's home and family.

> The prisoners are not totally isolated from society. People who work in prisons, prison guards, they've got wives and children and families, and lives of their own, too. You think he's going to want to get out of prison? Do you think he's going to like it there? How do you get out of prison? You escape. Oh, he can't escape surely. A man [James Earl Ray] escaped from a prison in the hills of Tennessee two years ago that was thought to be the most secure cell in the most secure prison in the United States. Why can't this man escape from the Harris County Work Camp, or from Reidsville, for that matter?

> What about those prison guards who have to guard him? What about their wives and families when he thinks no more of human life than what we know he thinks, when he's already proved he will kill, that he completely disregards human life, what about them, what about their families? You're going to subject those people to him for the next fifty years of his life?

> What about the young prisoners he's going to be associated with? What about the really young people? . . .

Finally, he made an appeal to the patriotism and bravery of the jury, exhorting them to join in the war against crime:

How many times have you said to yourself as you pick up your morning newspaper or turn on your radio or television newscast, has the whole world gone crazy, when you read about a crime like this, has the whole world lost its mind? . . . When have you said to yourself, what can I do, just one citizen, just one individual, to stop this? . . . Well, it's time for somebody to do something. . . . You're in the batter's box, so to speak . . . it's a matter of fish or cut bait, because we're right down to it, we're right down to it.

Frankly, the one thing I look for in selecting jurors in this case, the one characteristic, ... I looked for courage ... You know, we've had three wars in this Country just in my lifetime, World War II, war in Korea, war in Vietnam. In each of those wars we drafted young men, take them out of civilian life, train them, equip them, sent them to fight for us, young as seventeen, perhaps some as young as sixteen years of age. And, we've sent them off to some land halfway across the world, and we've pointed them at some individual that they didn't even know, and we've said, this person is the enemy, they are trying to destroy our way of life, when you see this person, kill him. And thank God we did it, don't get me wrong, because those individuals did save our way of life, they did protect our freedom, they're the reason we are able to live in this Country today under the system of freedom that we have. We've asked 17-year-olds to kill to protect our system, our home and our families. Do we ask any less of you in this situation?

Who is the enemy now? We're engaged in a war in this Country just as real as any of those, just as real, perhaps closer to home than any of those. . . . And now we're asking you to take the step to do something about this situation.

This dramatic appeal to gut emotion has no place in the courtroom, especially in a

---

**11.** The prosecutor failed to point out that for four of his eight years in the District Attorney's Office, between the Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its decision in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the constitutionality of the Georgia death penalty statute was very much in doubt.

case involving the penalty of death. A sentence of death imposed after such an appeal cannot be carried out. The sentencing hearing in this case was fundamentally unfair and therefore constitutionally intolerable.[12]

## VIII. JURY INSTRUCTIONS—SHIFTING THE BURDEN OF PROOF

Petitioner argues that under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), and *Mason v. Balkcom,* 669 F.2d 222 (5th Cir. Unit B 1982), *cert. denied,* —— U.S. ——, 103 S. Ct. 1260, 75 L.Ed.2d 487 (1983), the trial court's jury instructions on intent and malice impermissibly shifted the burden of proof to the defense. During the course of its charge to the jury the court instructed that intent "may be inferred from the proven circumstances or by acts and conduct, or it may be presumed when it is the natural and necessary consequence of the act." Even if this charge, in isolation, were impermissible, reversal would not be compelled. The petitioner would have to show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The instruction should be considered in light of the entire jury charge and the entire trial. *Lamb v. Jernigan,* 683 F.2d 1332, 1339 (11th Cir. 1982).

Immediately preceding the portion of the charge in question the court had instructed the jury that the accused is presumed to be innocent until proven guilty; that a person will not be presumed to act with criminal intention; that the state must prove the existence of criminal intent beyond a reasonable doubt; that intent must be found from the evidence produced at trial; and that circumstantial evidence alone would not justify a finding of guilt unless the circumstances are entirely consistent with the defendant's guilt, are wholly inconsistent with any reasonable theory of the de-

fendant's innocence and are so convincing as to exclude a reasonable doubt of the defendant's guilt. These prior instructions make it unlikely that the jury interpreted the challenged instruction on intent to be an impermissible burden-shifting or conclusive presumption. *Id.* Moreover, the challenged instruction by itself was not unconstitutional. Unlike the invalidated charge in *Sandstrom* which stated that "[t]he law presumes that a person intends the ordinary consequences of his acts," *Sandstrom, supra,* 442 U.S. at 513, 99 S.Ct. at 2453, this charge said that "intent . . . *may* be presumed." Rather than being a conclusive presumption, one that a reasonable juror would interpret as *requiring* an inference of intent, this presumption was permissive. A reasonable jury could only interpret this language as permitting the inference described—they were allowed to draw the inference, but they were not obligated to do so. *Lamb v. Jernigan, supra,* 683 F.2d at 1339–40; *see Ulster County Court v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979); *United States v. Gaines,* 690 F.2d 849, 853–54 (11th Cir.1982).

The court's instruction on malice was also valid. Reading from the statutory definition, the court told the jury that: "Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart." Ga.Code Ann. § 26–1101(a) (1976). This instruction tells the jury that a finding of malice may be based entirely on circumstantial evidence. It does not relieve the prosecution from its burden of proving malice beyond a reasonable doubt. In light of the court's explicit prior directions about circumstantial evidence, we find no error in the court's instruction on malice. *Lamb v. Jernigan, supra,* 683 F.2d at 1340.

---

**12.** Using the first three factors listed in note 7, we conclude that the prosecutor's inflammatory remarks were deliberate, extensive, and highly prejudicial to the accused.

## IX. EXCLUSION OF MITIGATING EVIDENCE

■ Hance's testimony in response to questions from his standby attorney was the only evidence presented in his behalf during the sentencing phase of the trial. At one point counsel stated: "You told us just yesterday that you didn't kill these girls." After Hance responded that he did not kill them, the prosecutor objected because, "that issue has been decided, it's over and behind us, it cannot be in mitigation from punishment at this time." Counsel explained to the judge that Hance's "thoughts around the subject are relevant." He expressed concern that the jury would "consider in aggravation the fact that he denied doing something they decided he did." He indicated that his questioning was to allow the jury "to consider his emotions for denying this crime in mitigation." The judge allowed the questioning to proceed. Hance was then asked if he believed that he had killed the girls, if he recalled having killed the girls, if he was speaking to the court sincerely during his trial and if he believed his testimony had been true. At this point the prosecutor objected and the court sustained the objection, directing counsel not to follow this line of questioning.

Petitioner claims that by sustaining the prosecutor's objection the court prevented the jury from considering relevant mitigating evidence, thereby violating the Eighth and Fourteenth Amendments as interpreted in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 874–76, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).[13] We find it significant that petitioner has never proffered any evidence that he was precluded from presenting. There is nothing in the record to suggest that the line of questioning that was objected to would have continued. Apparently, petitioner was trying to show the jury his reasons for pleading innocent. The questions that he was allowed to answer were sufficient for this purpose. Petitioner has failed to make out a constitutional violation.

## X. REMOVAL OF PROSPECTIVE JURORS WHO OPPOSED THE DEATH PENALTY

■ A state may exclude for cause, related to their opposition to the death penalty, only those veniremembers who "[make] unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" *Witherspoon v. Illinois,* 391 U.S. 510, 522–23 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968) (emphasis in original); *accord Adams v. Texas,* 448 U.S. 38, 44–45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980) ("[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."); *Burns v. Estelle,* 592 F.2d 1297, 1300 (5th Cir.1979) ("[O]nly the most extreme and compelling prejudice against the death penalty, perhaps only or very nearly a resolve to vote against it blindly and in all circumstances, is cause to exclude a juror on *Witherspoon* grounds."), *adhered to,* 626 F.2d 396 (5th Cir.1980) (en banc). The Fifth Circuit has strictly adhered to *Witherspoon*'s mandate. In *Granviel v. Estelle,* 655 F.2d 673 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982), this Court held that a veniremember's exclusion constituted a *Witherspoon* violation. When asked if he could ever vote to inflict the death penalty, the challenged veniremember had replied, "No, I don't *think* I could." He was then asked, "You don't *feel* like you would be

---

**13.** In *Eddings* the Supreme Court stated that "the sentencer [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 102 S.Ct. at 874.

entitled to take another person's life in that fashion?" He nodded and said, "No, I could not." The *Granviel* Court held that these questions and answers fell far short of the automatic rejection of the death penalty required under *Witherspoon. Id.* at 677 (emphasis in original).

Petitioner argues that two members of the venire, Syble Melton and Mary Turpin, were improperly excluded for cause in violation of *Witherspoon.* We agree. Their responses regarding the death penalty were not automatic and unequivocal. On the contrary, they expressed uncertainty about their convictions and ambiguity about their feelings. Their answers did not indicate that their views about capital punishment would substantially impair the performance of their duties as jurors under oath. *See Adams v. Texas, supra,* 448 U.S. at 45, 100 S.Ct. at 2526.

Mrs. Melton's answers vacillated. In response to some questions she appeared firm about refusing to vote for the death penalty, but her responses to other questions indicated a lack of conviction.

PROSECUTOR: No matter what the facts or circumstances of this case might be, you do not believe that you could follow the instructions of the Court to consider the death penalty and vote to impose it, is that right?

MRS. MELTON: No, sir, as I said before, I feel there are times when the death penalty is warranted. I do not believe that I with my conscience could vote to impose the death penalty.

PROSECUTOR: No matter what the facts or circumstances of the case might be?

MRS. MELTON: In some cases I might.

Before excusing her for cause, the judge asked a final question.

THE COURT: Let me just ask her my question too, then, are you so conscientiously opposed to capital punishment that you would not vote for the death penalty under any circumstances?

MRS. MELTON: As I said before, I believe there are circumstances where the death penalty is warranted. I do not believe that I could vote for it.

Mary Turpin was even less resolute in her feelings about the death penalty. Although her initial responses to the prosecutor's questions indicated that she would not vote for a sentence of death, upon further examination she changed her mind.

COUNSEL: If you thought from the facts you heard in the whole case that that was the proper decision to make, that he should be electrocuted, could you vote that that was what you thought should be done?

MS. TURPIN: Well, this is hard, I don't know. I'm just too confused. I don't know.

\* \* \* \* \* \*

THE COURT: Well, what we want to find out is if he should be found guilty, after you've heard all the circumstances about this case, do you think that there is any way that you could vote to have him executed, that is, to find for the death penalty?

MS. TURPIN: Well, I guess I could.

\* \* \* \* \* \*

THE COURT: Well, that's what we need to find out whether or not you could vote for death if the circumstances of the trial, after you've learned all about it, whether or not you could, not that you would, whether you could vote to impose the death penalty?

MS. TURPIN: Well, I don't know. I just say that I don't think I could.

THE COURT: You don't think you could? I believe the juror should be excused for cause. . . .

If veniremembers who express serious reservations about the death penalty are excluded from a jury, that jury cannot fairly represent a cross-section of the community. It is a jury "uncommonly willing to condemn a man to die." *Witherspoon, supra,* 391 U.S. at 521, 88 S.Ct. at 1776. Such a jury lacks the impartiality required by the Sixth and Fourteenth Amendments. *Id.* at 518, 88 S.Ct. at 1775. A sentence of death imposed by such a jury cannot stand. *Id.* at

522–23, 88 S.Ct. at 1777–78. We hold that the exclusion of Syble Melton and Mary Turpin was a constitutional violation requiring reversal of Hance's sentence.

The state argues that even if Ms. Turpin's exclusion was a *Witherspoon* violation it was harmless error because she was excluded only from a pool of possible alternate jurors, and would not have been considered for this jury or for an alternate position. The state's argument is precluded by *Davis v. Georgia,* 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976) (per curiam), which held that the improper exclusion of even one out of 83 veniremembers was grounds for reversal of a death sentence. The scope of this holding is clarified by Justice Rehnquist in dissent who refers to it as "a *per se* rule that precludes application of even the harmless-error test of *Chapman v. California,* 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705] (1967)." 429 U.S. at 123–24, 97 S.Ct. at 399–400; *accord Burns v. Estelle,* 592 F.2d 1297, 1299–1300 (5th Cir.1979), *adhered to,* 626 F.2d 396 (1980) (en banc); *Moore v. Estelle,* 670 F.2d 56, 57 (5th Cir.), *cert. denied,* ―― U.S. ――, 102 S.Ct. 3495, 73 L.Ed.2d 1375 (1982). The state's argument that the *Witherspoon* violation was harmless because two peremptory challenges remained after the jury was selected also must fall under the holding of *Davis.* *Burns v. Estelle, supra,* 592 F.2d at 1299–1300; *Moore v. Estelle, supra,* 670 F.2d at 57; *Blankenship v. State,* 280 S.E.2d 623, 623 (Ga.1981).

 Petitioner's argument that the trial court denied him due process by refusing to exclude veniremember Kathryn Hamilton for cause after she showed bias in favor of the death penalty, while excluding veniremembers Turpin and Melton for their opposition, lacks merit. We read *Adams v. Texas, supra,* 448 U.S. at 45, 100 S.Ct. at 2526, to suggest that if veniremembers cannot be excluded because of their views against the death penalty unless those views would substantially impair the performance of their duties, the same standard should apply to a veniremember in favor of the death penalty.[14] A person who favors the death penalty can be entrusted to make the choice between death and life imprisonment unless that person's bias for capital punishment is unequivocal and absolute. *See Witherspoon, supra,* 391 U.S. at 519, 522 n. 21, 88 S.Ct. at 1775, 1777 n. 21. In this case, Ms. Hamilton indicated that she would follow the court's instructions even though she favored imposing the death penalty. Because her decision would not be automatic, the trial court's decision not to exclude her for cause was not a denial of due process.

## XI. THE JURY CHARGE ON VENUE

 Petitioner claims that the trial court's failure to specifically charge the jury on the issue of venue was constitutional error. He argues that venue is an essential element of a criminal offense, *Parks v. State,* 212 Ga. 433, 93 S.E.2d 663 (1956), so under *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), it must be properly charged and proved beyond a reasonable doubt. Although under Georgia law venue is part of the state's case and must be proved beyond a reasonable doubt, *Dickerson v. State,* 186 Ga. 557, 199 S.E. 142 (1938), the State of Georgia treats venue as a jurisdictional fact, *id.,* not as an element of the offense of murder; therefore, *In re Winship* does not apply. *See Engel v. Isaac,* 456 U.S. 107, 119–21, 102 S.Ct. 1558, 1567–68, 71 L.Ed.2d 783 (1982). The Constitution does not require that venue be proved beyond a reasonable doubt. *See United States v. Turner,* 586 F.2d 395, 397 (5th Cir.1978), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1979).

14. Dictum in *Stroud v. United States,* 251 U.S. 15, 20–21, 40 S.Ct. 50, 52, 64 L.Ed. 103 (1919), *reh'g denied,* 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317 (1920), indicated "it may well be" that a challenge for cause to a veniremember who was "in favor of nothing less than capital punishment" should have been sustained. Petitioner relies on *Stroud* for the proposition that a juror should be excused for cause if that juror is reasonably certain to render a verdict of death. But *Stroud* was not a habeas case, and the Supreme Court did not indicate that the trial court's refusal to excuse for cause was an error of constitutional magnitude.

Under Georgia law, if the trial court charges the jury generally on the law of reasonable doubt and there is sufficient evidence of venue,[15] the court need not specifically charge the jury that proof of venue is a material allegation of the indictment. *Harwell v. State,* 230 Ga. 480, 197 S.E.2d 708, 709 (1973). In this case the state's prima facie showing on venue was uncontradicted by the petitioner who introduced no contrary evidence. The trial court instructed the jury that each material element of the indictment must be proved beyond a reasonable doubt. The court's failure to specifically instruct on venue was therefore not error under state law. There is no question that it was not error of constitutional magnitude. *See, e.g., United States v. Jenkins,* 510 F.2d 495, 498 (2d Cir.1975) (court's only reference to venue was made in reading the indictment—not reversible error).

## XII. EVIDENTIARY HEARING IN THE DISTRICT COURT

The written factual findings of a state court are presumed to be correct unless one of the exceptions set out in 28 U.S.C.A. § 2254(d) is established. *Sumner v. Mata, supra,* 449 U.S. at 544–45, 101 S.Ct. at 767–68. This is true even if the factual findings are made by a state appellate court. *Id.* at 545–46, 101 S.Ct. at 768–69. When a state court has afforded the petitioner a full and fair evidentiary hearing on all legitimate factual issues, a district court is not required to conduct an evidentiary hearing. *Heyd v. Brown,* 406 F.2d 346, 347 (5th Cir.), *cert. denied,* 396 U.S. 818, 90 S.Ct. 53, 24 L.Ed.2d 69 (1969).

Hance submitted a 35-page petition to the district court, alleging numerous constitutional violations and claiming that he was denied a full evidentiary hearing on these matters. The district court denied his application without a hearing. After a study of the record, we conclude that the State of Georgia has afforded the petitioner a full and fair hearing on all the factual issues involved in this case. The district court's denial of an evidentiary hearing was therefore proper.

For the reasons stated in Parts VII and X of this opinion, petitioner's death sentence must be set aside. The case is remanded to the district court with directions that the State of Georgia determine within a reasonable time whether (1) to conduct a new sentencing proceeding, in the manner provided by state statute, or (2) to vacate petitioner's sentence and impose a sentence less than death in accordance with state law.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION.

---

**15.** Evidence as to venue, though slight, is sufficient where there is no conflicting evidence. *Ellard v. State,* 233 Ga. 640, 212 S.E.2d 816, 818 (1975).