**William Anthony BROOKS, Petitioner,**

v.

**Robert FRANCIS, Warden, Georgia Diagnostic and Classification Center, Respondent.**

**No. 83–8028.**

United States Court of Appeals, Eleventh Circuit.

Sept. 15, 1983.

Stephen B. Bright, Atlanta, Ga., for petitioner.

Mary Beth Westmoreland, Asst. Atty. Gen., Atlanta, Ga., for respondent.

Before FAY, HENDERSON and HATCHETT, Circuit Judges.

HATCHETT, Circuit Judge:

William Anthony Brooks seeks reversal of the district court's denial of habeas corpus relief pursuant to 28 U.S.C.A. § 2254. He is under a sentence of death for the rape, kidnapping, armed robbery, and murder of a young woman. We remand for a new sentencing hearing.

## I. Facts

In July, 1977, Carol Jeannine Galloway, a young, popular, piano teacher and choir director, was abducted from her mother's home in Columbus, Georgia. Carol was white, single, and twenty-three years old. At the time of the abduction, the Columbus news media was giving extensive coverage to a series of brutal murders occurring in the community, including the killing of four white women in their homes by an unknown "silk stocking strangler."

On the morning of Carol's abduction, she planned to meet a friend for breakfast. Shortly after Carol left the house to get into her automobile, her mother went to the side door. Mrs. Galloway, the mother, noticed that Carol was in the utility room at the end of the carport; she would not come out when called.

When called a second time, Carol responded that she was searching for something. When Mrs. Galloway offered to help, Carol replied, "No, go back into the house, I'll call you whenever I find it and get ready to go." Perceiving that something was wrong, Mrs. Galloway returned to the house to call for help. Before she was able to reach anyone, Carol's friend called to ask why Carol had not yet picked her up. Going back to the door, Mrs. Galloway saw Carol in her automobile backing out of the driveway with a black male sitting in the automobile beside her.

Carol's automobile was found abandoned later that day. A search of the automobile produced a brown lady's wallet containing ninety-eight cents and personal papers belonging to Carol. That same morning several people saw a male, identified at trial as Brooks, walking through the community where police investigators found the automobile. He wore no shirt, and his pants were covered with mud. Brooks asked several of these people to drive him either to Wynnton or the Columbia Heights area. In each instance, the person refused. Finally, Brooks came upon Morris Comer, who agreed to drive him to the Columbia Heights area for five dollars. During the trip, Brooks told Comer that police officers had shot at him in the woods, and he had fallen into a ditch and gotten his pants muddy. Comer left Brooks at a street corner; Brooks paid Comer six dollars.

The next day, police officers found the body of Carol Jeannine Galloway. She had been raped, and her death resulted from a single gunshot to the neck. Upon Brooks's arrest in Fulton County, he made two statements to the police. In the first statement, he stated that he found Galloway's automobile with the keys in it, that he drove it, that he wrecked it, and that he ran away. In the second statement, Brooks admitted all the elements of the offenses for which he stands convicted. According to his

statement, after he raped Carol, he pointed his pistol at her to keep her from screaming, and the pistol went off. He then ran away.

## II. Procedural History

Brooks was convicted of murder, kidnapping, rape, and armed robbery in the Superior Court of Muscogee County, Georgia. The court sentenced Brooks to death on the murder charge, to life imprisonment on the kidnapping and rape charges, and to twenty years imprisonment on the armed robbery charge. On automatic appeal to the Supreme Court of Georgia, all convictions and sentences were affirmed. *See Brooks v. State,* 244 Ga. 574, 261 S.E.2d 379 (1979).

On writ of certiorari to the United States Supreme Court, the Court vacated the decision of the Georgia Supreme Court, but left intact the death penalty, remanding the case for further consideration in light of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). *Brooks v. Georgia,* 446 U.S. 961, 100 S.Ct. 2937, 64 L.Ed.2d 821 (1980). On remand, the Supreme Court of Georgia reviewed the death penalty pursuant to the seven statutory aggravating circumstances in the Georgia death penalty statute and again affirmed the death sentence. *Brooks v. State,* 246 Ga. 262, 271 S.E.2d 172 (1980).

The United States Supreme Court denied a second petition for writ of certiorari.

Brooks then filed a petition for habeas corpus relief in state court. Relief was denied. The Supreme Court of Georgia later denied Brooks's (1) application for a certificate of probable cause to appeal, and (2) application for reconsideration. In July, 1982, Brooks filed a third petition for writ of certiorari in the United States Supreme Court. The Supreme Court denied the petition. *Brooks v. Zant,* —— U.S. ——, 103 S.Ct. 183, 74 L.Ed.2d 148 (1982).

When ordered executed, Brooks petitioned for habeas corpus relief in the United States District Court for the Middle District of Georgia, Columbus Division, and moved for a stay of execution order. The district court denied habeas corpus relief without conducting an evidentiary hearing, concluding that a full and fair hearing had been held in state court. The district court also denied the request for a stay of execution order.

The Eleventh Circuit Court of Appeals granted Brooks's request for a certificate of probable cause to appeal, stayed the pending execution, expedited the appeal, and set the case for oral argument.

## III. Issues

■ The standard of review for habeas corpus petitions by state prisoners in federal court is enunciated in 28 U.S.C.A. § 2254(d).[1] This court may not presume

---

1. Title 28 U.S.C.A. § 2254(d) states that:

(d) In any proceeding instituted in a Federal court by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct,* unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the fact finding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding; or

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

the correctness of the findings of the state court if it determines that the habeas corpus applicant did not receive a full, fair, and adequate hearing in the state proceeding, or that the applicant was otherwise denied due process of law in the state court proceeding. 28 U.S.C.A. § 2254(d)(6), (7). The presumption of correctness afforded state proceedings does not apply to mixed questions of law and fact. *Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Hance v. Zant*, 696 F.2d 940, 946 (11th Cir.1983).

The issues we are called upon to decide are (1) whether the trial court properly declined to grant a change of venue; (2) whether prosecutorial misconduct at the guilt and sentencing stages of trial constituted prejudicial error; (3) whether the introduction of non-statutory aggravating evidence at the sentencing phase of the trial constituted reversible error; (4) whether the trial court impermissibly restricted the admission of mitigating evidence at the sentencing phase of the trial; (5) whether the trial court's instructions to the jury concerning aggravating circumstances were proper; (6) whether the trial court's instructions to the jury on intent impermissibly shifted the burden to the defendant to prove a crucial element of the offense; and (7) whether jurors were improperly excluded from participation based upon their opposition to the death penalty; and (8) whether the district court properly declined to grant an evidentiary hearing. In order to "leave tracks" in the event of future litigation, we discuss all issues presented.

### IV. Change of Venue

Brooks contends that pre-trial publicity relating to Carol Galloway's death, his arrest, and his trial violates the due process standards established in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) and *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In *Irvin,* the Supreme Court vacated a death sentence because of pre-trial publicity. The Court held that a change of venue should have been granted where widespread publicity concerning a murder was of such a nature that (1) citizens on the street openly discussed the presumed guilt of the defendant on radio with roving reporters, (2) newspapers published a barrage of articles, pictures, and cartoons for the six or seven months preceding defendant's trial, and (3) newspaper articles discussed the defendant's juvenile conviction, his conviction for arson twenty years previously, and details of his military court martial charges. 366 U.S. at 725, 81 S.Ct. at 1644.

In *Rideau,* where a defendant's confession was shown on television throughout the community from which the jurors were selected, the Supreme Court reversed the death penalty. The Court stated that the denial of change of venue was also a denial of due process because "this spectacle [the televised confession] to the tens of thousands of people who saw and heard it ... *was* Rideau's trial ... [so that] [a]ny subsequent court proceeding in a community so pervasively exposed ... could be but a hollow formality". 373 U.S. at 726, 83 S.Ct. at 1419 (emphasis in original).

The murder of Carol Galloway, coming soon after the murder of other women from the community, generated great interest in the Columbus, Georgia community. After Brooks's arrest, the *Sunday Ledger-Enquirer,* a local newspaper, carried a four-column headline proclaiming "Detective Testifies Brooks Admitted Killing Woman."[2] Other

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

2. The article went into some detail, stating:
 Detective Ronald Lynn testified in Recorders' Court that Brooks said, "All right. I did it. Y'all put it (the case) together. I did it." Lynn read into the record a written statement which

headlines carried by the Columbus *Ledger-Enquirer,* from the time of the murder until the time of trial, included "Abducted Woman Is Still Missing," "500 Attend Jeannine Galloway's Funeral," "Brooks Indicted for Galloway Slaying, Suspect Is Identified in Galloway Slaying," and "Murder Suspect Also Sought In Atlanta Rape." All twelve persons who eventually became jurors were aware of the publicity surrounding the case.[3]

Brooks argues that the nature and extent of the publicity (including the televising of the trial) combined with the inadequacy of voir dire mandated a change of venue. Brooks asserts that the court's refusal to grant a change of venue constituted error of such magnitude as to deprive him of a fair trial by an impartial jury.

■ Georgia law provides that a court change venue if it determines that an impartial jury can not be selected in the county where the crime occurred. Ga.Code Ann. § 27–1201 (recodified at Off.C.Ga.Ann. § 17–7–150 (1982)). To establish that a change of venue is warranted, a defendant must show either circumstances which are prejudicial to his right to an impartial trial or actual jury partiality. *See Murphy v. Florida,* 421 U.S. 794, 804, 95 S.Ct. 2031, 2038, 44 L.Ed.2d 589 (1975); *Mayola v. Alabama,* 623 F.2d 992, 996 (5th Cir.1980).

■ Although the jurors in this case were aware of the facts of the crime, no showing of prejudice on the part of any particular juror was established. Billy Weaver, the juror having the most information about the case, stated that he had no pre-conceived opinion as to Brooks's guilt based on his knowledge of the case. Jurors

may have some knowledge of the facts and issues involved in a case in which they participate. As the Supreme Court stated:

It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any pre-conceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd,* 366 U.S. at 722–23, 81 S.Ct. at 1642–43.

Brooks did not establish to the satisfaction of the court conditions sufficiently prejudicial to his right to an impartial jury. Aware that the publicity may have been prejudicial to Brooks's case, the trial court attempted to ascertain whether conditions required a change of venue. The court noted at the change of venue hearing that "based on publicity alone, I will agree with you this is one that should not be tried in Muscogee County ... [so that] I am going to let you exhaustively question the jurors on individual voir dire."

On voir dire, the trial court excused for cause any juror who had read the statements Brooks made to police. Defense

---

he said Brooks signed which gave a detailed account of the July 15 rape and killing.

. . . . .

Dist. Atty. Mullins Whisnant said the car theft, kidnapping, rape and murder charges against Brooks will be presented to a grand jury Tuesday. Whisnant, who reiterated he intends to ask for the death penalty, estimated Brooks would be tried within 60 days.

**3.** Jurors differed in how much they had read about the case: On voir dire, juror Donnie Lontz said that she read in a newspaper "some-

thing about a girl went out to the garbage can or something like that, that's all, I didn't pay that much attention to it." Juror Billy Weaver, on the other hand, stated that he had read that "the girl, Miss Galloway, was taken from the home, and found three days later murdered and raped. And, the defendant caught in Atlanta." Weaver also stated that he "read where [the defendant] admitted it," and saw on television "films of where they were bringing [the defendant] back in."

counsel was given an opportunity to question the jurors on whether they had formed an opinion in the case, whether they had any prejudices against a black defendant in a murder case where the victim was a white female, and whether they had fixed scruples on the death penalty. Through these questions and others, the trial court ascertained whether the jurors were improperly influenced by outside publicity. Jurors improperly influenced were excused.

■ This case is easily distinguishable from *Irvin* and *Rideau.* In the *Irvin* case, 90%, or 370 of the jurors examined on voir dire had an opinion as to the defendant's guilt. Here, few jurors expressed an opinion as to Brooks's guilt. In *Irvin,* the petitioner, without additional preemptory challenges, was precluded from excluding jurors which he felt to be prejudiced against his defense. Here, Brooks did not protest the selection of any of the jurors on grounds of prejudice. In *Rideau,* a defendant's confession was televised three times prior to trial, but never admitted into evidence. Here, only the trial was televised. The trial court did not err in failing to grant Brooks's motion for a change of venue. Widespread publicity about a crime or a criminal trial is not, in itself, indicative of a partial jury.

### V. Professional Misconduct

■ Brooks next argues that prosecutorial misconduct at the guilt and sentencing phases of his trial denied him a fundamentally fair trial. The standard for reviewing a claim of prosecutorial misconduct in a habeas corpus case is: whether the prosecutor's actions are of such a nature as to render the trial fundamentally unfair. *Donnelly v. De Christoforo,* 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Hance,* 696 F.2d at 950; *Cobb v. Wainwright,* 609 F.2d 754, 756 (5th Cir.), *cert. denied,* 447 U.S. 907, 100 S.Ct. 2991, 64 L.Ed.2d 857 (1980).

Capital trials in Georgia are a two-fold process. First, a jury must determine the guilt or innocence of the defendant. After a jury finds a defendant guilty, a sentencing hearing is conducted at which mitigating and statutory aggravating circumstances are introduced. If any statutory aggravating circumstances exist, the jury may recommend either death or life imprisonment. *See Hance,* 696 F.2d at 950; Ga. Code Ann. §§ 26–3102, 27–2503(b) (recodified at Off.C.Ga.Ann. §§ 17–10–31, 17–10–2(b). Because of the two-fold process, errors relating to the guilt-innocence phase and the sentencing phase are examined separately. When error occurs in the sentencing phase, judicial correction will apply only to the issue of punishment. *Hance,* 696 F.2d at 950.

■ The prosecutor's conduct during the entire trial was questionable. In his opening statement, the prosecutor informed the jury that the state had more witnesses than it would need to call to prove its case. Attorneys are forbidden from saying anything to the jury to imply that evidence supporting their position exists but has not been introduced at trial. *United States v. Morris,* 568 F.2d 396, 401 (5th Cir.1978). The prosecutor personally swore for the veracity of certain witnesses, and expressed his opinion regarding the credibility, or the lack thereof, of Brooks's sister.[4] A prosecutor is prohibited from asserting his personal beliefs as to the veracity of witnesses. *United States v. Rodriguez,* 585 F.2d 1234, 1244 (5th Cir.1978); *Morris,* 568 F.2d at 401.

■ Although the prosecutor's actions during the guilt-innocence phase of the trial were questionable, we are required to consider the impact of those actions in light of the strength of the totality of the evidence. Additionally, while it is clear that the prosecutor's statements were outside the normal bounds by which we judge United States attorneys, the Fifth Circuit recognizes that

---

4. The prosecutor told the jury:
 And then, his sister took the stand and said "yes, Captain Graham called me and said a bunch of red-neck policemen are looking for him."

*I don't believe that, I don't believe Captain Graham said that. You saw him testify. I believe he had more sense than that. I don't believe he would have made a statement like that.* [Emphasis added.]

"the permissible scope of jury argument for Georgia district attorneys is very broad— much more so than for United States attorneys." *Bryant v. Caldwell,* 484 F.2d 65, 66 (5th Cir.1973). In reviewing the conduct of a Georgia prosecutor, this court will not apply standards normally reserved to United States attorneys. Instead, this court will look to the more basic question: whether the prosecutor's actions were so prejudicial that they rendered the trial fundamentally unfair. *Jones v. Estelle,* 622 F.2d 124, 127 (5th Cir.1980) (prosecutorial misconduct, though outside the bounds of propriety, is not reversible error where it does not render the trial fundamentally unfair). Applying this standard, in light of the considerable strength of the case against Brooks, the prosecutor's comments did not reach a level which made the trial fundamentally unfair in the guilt-innocence phase.

 The prosecutor's actions at the sentencing phase of this trial are viewed differently. At the sentencing phase of trial, the jury must not be influenced by any arbitrary factors. A prosecutor may not incite the passions of a jury when a person's life hangs in the balance. *Hance,* 696 F.2d at 951. In *Hance,* a prosecutor's inflammatory remarks, appealing to an already emotionally aroused jury during the sentencing phase of a murder prosecution, rendered the sentencing hearing fundamentally unfair and constitutionally intolerable. In *Hance,* the prosecutor appealed to the jury's fears that the defendant might escape, telling them:

> The prisoners are not totally isolated from society . . . . You think he's going to want to get out of prison? Do you think he is going to like it there? How do you get out of prison? You escape. Oh, he can't escape surely. A man [James Earl Ray] escaped from a prison in the hills of Tennessee two years ago that was thought to be the most secure cell in the most secure prison in the United States. Why can't this man escape from the Harris County Work Camp, or from Reidsville, for that matter?

696 F.2d at 952. The prosecutor in this trial also appealed to the jurors' fear that he might escape, saying:

> How about if he escaped? And, I'm sure they're going to say, 'Oh, he couldn't escape.' But, it was the early part of this year, or late last year, I don't recall now, that a man escaped from a prison in Tennessee that no one had ever escaped from before. So, you've always got the possibility that he might escape and be out on the streets, and who knows who it will be next time, whose daughter will it be next time?

In *Hance,* the prosecutor made an emotional appeal to the jury to use the death penalty in the war against crime, stating:

> How many times have you said to yourself as you pick up your morning newspaper or turn on your radio or television newscast, has the whole world gone crazy, when you read about a crime like this, has the whole world lost its mind? . . . When have you said to yourself what can I do, just one citizen, just one individual, to stop this?

696 F.2d at 952. The prosecutor in this trial also invited the jurors to use the death penalty as a solution to crime in the streets:

> You know, lots of times you see people on the street, and they are always stopping us and saying, 'you know, something has got to be done about this crime wave, what can we do, Mr. Whisnant; what can we do, Mr. Smith, we've got to do something about it.' Well, you have an opportunity to do something about it right now. . . . The buck stops with you today.

Finally, the prosecutor in *Hance* made a direct appeal to the patriotism of the jurors:

> Frankly, the one thing I look for in selecting jurors in this case, the one characteristic . . . I looked for courage . . . . You know, we've had three wars in this Country just in my lifetime, World War II, war in Korea, war in Viet Nam. In each of those wars we drafted young men, take them out of civilian life, train them, equip them, sent them to fight for us, young as seventeen, perhaps some as

young as sixteen years of age. And, we've sent them off to some land halfway across the world, and we've pointed them at some individual that they didn't even know, and we said, this person is the enemy, they are trying to destroy our way of life, when you see this person, kill him. And thank God we did it, don't get me wrong, because those individuals did save our way of life, they did protect our freedom, they're the reason we are able to live in the Country today under the system of freedom that we have. We've asked seventeen year olds to kill to protect our system, our home and our families. Do we ask any less of you in this situation?

Who is the enemy now? We're engaged in a war in this Country just as real as any of those, just as real, perhaps closer to home than any of those .... And now we are asking you to take the step to do something about this situation.

696 F.2d at 952. In an almost identical passage, the prosecutor in this sentencing hearing also appealed to the patriotism of the individual jurors:

Let me say this to you, during my lifetime this country has been in three wars, each war we've taken our young men down to the age of seventeen, we've trained them, we've put guns in their hands, we've taught them how to kill the enemy and we've sent them overseas, and they have killed up the human beings who are enemies of our country, and when they did a good job of killing them, we decorated them and gave them citations, praised them for it.

We, I say to you that we are in a war again in this Country, except it's not a foreign nation, its against a criminal element in this country, that is who we are at war with, and they're winning the war, is what so bad, and if you don't believe they're winning, just look about you. And, if we can send a seventeen year old young man overseas to kill an enemy soldier, is it asking too much to ask you to go back and vote for the death penalty in this case against William Brooks, and I submit to you that he's an enemy, and

he's a member of the criminal element, and he's our enemy, and he is an enemy of the law abiding citizens and the people who want to live peacefully in this country, and who want to be secure in their persons and their homes.

In this case, as in *Hance,* the prosecutor played upon the fears and prejudices of the jurors during the sentencing hearing arguments to produce a death sentence. By his comments, the prosecutor invited the jury to decide the life-death verdict in a frenzied and emotional setting. *Hance* is directly applicable to this situation. *Hance* demands that we hold that the prosecutor's actions constituted misconduct to the extent that it denied Brooks a fundamentally fair sentencing hearing.

■ In holding that the prosecutor's misconduct during the sentencing phase of trial rendered Brooks's sentencing hearing fundamentally unfair, this court does not hold that a prosecutor may not argue a case using simple, blunt, or colorful speech. The prosecutor may use speech specifically designed to let the jurors understand as easily as possible the merits of the argument. Prosecutors may discuss facts which are in evidence and even in "vivid detail." *Hance v. Zant,* 696 F.2d at 951. It is not improper to remind the jury of its solemn obligation, of its awesome responsibility, or of the importance of the task at hand. We doubt that it is improper to simply compare the duties of citizens serving on juries with those of citizens serving in the armed forces. This court will not condemn a discussion of whether or not a sentence of death is appropriate in a given case because that is the issue being decided in the sentencing phase of the trial under Georgia law.

■ It is, however, improper to discuss whether or not our jails are run properly, have adequate security, or allow for multiple escapes. Such is not an issue in the case at hand. It is equally improper to urge the imposition of a sentence of death because of the dangers to other prisoners through exposure to this individual if confined togeth-

er. Such is not an issue in this case. The same holds true as to the dangers to prison guards and their wives and families. Such matters have no relevance to the issues being decided. It is equally improper to suggest that jurors should "kill" all members of the criminal element because they are enemies of society. The American system of justice does not operate in that fashion. Sentences should be imposed upon the "individual" found guilty of committing the crime charged. The sentence must be appropriate for that individual and for that crime. All trial attorneys should assist the courts and juries in achieving that end. Fairness is essential.

█ This does not mean that prosecutors cannot be zealous, enthusiastic and determined. What the law condemns is the imposition of a sentence for the wrong reason. Prosecutors violate their responsibilities when they urge as much.

### VI. Non-Statutory Aggravating Circumstances

█ Brooks next alleges that the jury was allowed to consider evidence, in making its sentencing determination, which did not address the aggravating circumstances enumerated in section 27–2534.1(b) (recodified Off.C.Ga.Ann. § 17–10–30).[5] After instructing the jury on the three statutory aggravating circumstances alleged by the state during the sentencing hearing, the trial court instructed the jury:

> In arriving at your determination, you are authorized to *consider all the evidence received throughout this trial,* presented by both the state and the defendant. You are authorized to include in your consideration the facts and circumstances, if any, in mitigation and aggravation. [Emphasis added.]

Brooks alleges that this jury instruction permitted the jury in the sentencing phase, to consider his previous conviction for robbery with a dangerous weapon and the testimony of his juvenile probation officer, introduced during the sentencing hearing, as well as evidence presented at the guilt-innocence phase of the trial. He asserts that the consideration of non-statutory aggravating circumstances is prohibited by *Henry v. Wainwright,* 661 F.2d 56 (Unit B. 5th Cir.1981), *vacated on other grounds,* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982), *judgment reinstated,* 686 F.2d 311 (Unit B. 5th Cir.1982), and *Proffitt v. Wainwright,* 685 F.2d 1227 (11th Cir.1982).

**5.** The statutory aggravating circumstances upon which a death sentence may be based after conviction of murder in Georgia are:

(1) The offense of murder ... was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions;

(2) The offense of murder ... was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree;

(3) The offender by his act of murder ... knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty;

(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

(7) The offense of murder, rape, armed robbery or kidnapping was outrageously or wantonly vile, horrible, or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim;

(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another. Ga. Code § 27–2534.1(b) (1978) (recodified Off.C. Ga.Ann. § 17–10–30(b)).

The Supreme Court of Georgia has stated the following in relation to pre-sentence trials:

> The purpose of a presentence trial is to introduce different evidence from that at trial to determine guilt or innocence. On this issue of guilt or innocence, the only relevant evidence is that which pertains to the offense with which the defendant is charged. *In a presentence trial, the trier of fact must make a determination as to the sentence to be imposed, taking into consideration all aspects of the crime, the past criminal record or lack thereof, and the defendant's general moral character. Any lawful evidence which tends to show the motivation of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes is admissible in aggravation, subject to the notice provisions of the statute. . . . In a capital presentence trial, the state is not limited to the introduction of evidence to support the particular statutory aggravating circumstances it is relying upon.*

*Fair v. State,* 245 Ga. 868, 873–74, 268 S.E.2d 316, 312, *cert. denied,* 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980) (citations omitted) (emphasis added). Based on the above, the testimony of the probation officer, and the evidence of Brooks's prior conviction are admissible, as is any evidence presented at trial which supports an aggravating statutory circumstance alleged by the state.

*Henry* and *Proffitt* are distinguishable from the instant case. Both cases deal with the application of the Florida death penalty statute, rather than the application of the Georgia death penalty statute. Moreover, we do not read these two cases as holding that no evidence presented at the guilt phase of trial may be considered as an aggravating circumstance during the sentencing phase. Both cases hold only that non-statutory aggravating circumstances may not be used to support the death penalty. *Henry,* 686 F.2d at 315; *see Proffitt,* 685 F.2d at 1266.

In *Henry,* the trial court instructed the jury to consider "all factors which are aggravating including, *but not limited to,* the following . . . ." and then listed the aggravating circumstances proscribed by section 921.141(5), Florida Statute (1981). 661 F.2d at 57 (emphasis added). The Florida Supreme Court construed the statute as providing an exclusive list of aggravating factors. *Purdy v. State,* 343 So.2d 4, 6, *cert. denied,* 434 U.S. 847, 98 S.Ct. 153, 54 L.Ed.2d 114 (1977).

In *Proffitt,* the trial court relied upon the appellant's "propensity to commit the crime for which he was convicted" as the basis upon which to support the death penalty. 685 F.2d at 1266. Neither *Henry* nor *Proffitt* is applicable to this case. Non-statutory aggravating circumstances were not impermissibly introduced for consideration by the jury.[6]

## VII. Impermissible Restriction of Mitigating Evidence

Brooks asserts that mitigating evidence presented at the sentencing phase of his trial, specifically, the testimony of his mother and two sisters, was severely and unconstitutionally restricted. We disagree. An examination of the record supports a finding that while the state frequently objected to questions asked by defense counsel, Brooks's mother and sisters were al-

---

**6.** The Supreme Court, in *Barclay v. Florida,* —— U.S. ——, ——, 103 S.Ct. 3418, 3426, 77 L.Ed.2d 1134 (1983) noted that both the Florida and Georgia criminal statutes require that the sentencing court make a finding of at least one statutory aggravating circumstance in order to impose the death penalty. The sentencing court may consider, however, any evidence relevant to sentencing. The Georgia Statute differs from the Florida Statute in that the Florida Statute requires that the trial court balance statutory aggravating circumstances against statutory mitigating circumstances. Inclusion of a nonstatutory aggravating circumstance upsets the weighing process. See —— U.S. at ——, 103 S.Ct. at 3427. No balancing of statutory aggravating and mitigating circumstances is required by Georgia law. Therefore, a Georgia court's consideration of a non-statutory aggravating circumstance where a valid statutory aggravating circumstance has been found does not in itself create reversible error.

It should be noted that in *Barclay* no mitigating circumstance was found.

lowed to testify about Brooks's mistreatment as a boy, and his problems with the law. The first objection by the state to the testimony of Brooks's mother occurred because she attempted to testify as to how Brooks "felt." She went on to testify about the beatings, about his stuttering, and about the trouble he got into resulting from the beatings.[7] The Supreme Court has held that relevant mitigating evidence cannot be excluded from the jury's consideration. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In this case, no relevant mitigating evidence was excluded.

## VIII. Overbroad Construction of Aggravating Circumstances

Brooks asserts that the trial court failed to properly guide the discretion of the jury during the sentencing phase of the trial as to the construction and application of section 27–2534.1(b)(7), Georgia Code Annotated. The trial court instructed the jury that it could return a sentence of death if, in addition to the two other aggravating circumstances specified, it found that the offense of murder was "outrageously or wantonly vile, horrible or inhuman in that it involved an aggravated battery to the victim." This instruction is modeled after subsection (b)(7) of the Georgia statute. The court failed to mention the other two components of subsection (b)(7), i.e., depravity of mind or torture. The jury returned a finding of the following aggravating circumstances: "armed robbery and rape, and the offense of mur-

---

7. Brooks's mother testified, in pertinent part that:

MRS. BROOKS: [M]y husband took ill, and mistreated the family, so we had to separate, and I got a divorce. So, I had to start going out to work, and William always felt that he wasn't loved.

MR. WHISNANT: I object to that now, she couldn't know how he felt.

THE COURT: Sustain the objection, you ladies and gentlemen disregard that.

A: Well, he told me that he felt that nobody cared.

MR. WHISNANT [prosecutor]: I object to that, too, now.

THE COURT: Yes, sustain the objection to what he told her.

MR. SANDERS [defense counsel]: Your Honor, I thought the rules were much more liberal on the sentencing phase.

THE COURT: They are, but they're not this liberal.

MR. WHISNANT: The law says evidence, as I understand it.

THE COURT: That is correct, it's got to be admissible evidence.

A: Well, I wasn't there with him because I was working two jobs, and the older kids took care of the small kids. And, I remarried, and this is when the husband I had, the children didn't agree with, and they had a misunderstanding and William was constantly beaten by my husband while I wasn't there, and he had beaten him one day—

MR. WHISNANT: I object to that if she wasn't there, unless she knows it some other way now.

THE COURT: Well, I'll let her continue to testify, but Mr. Sanders keep her within reasonable bounds.

A: Beating, I think caused him—he began to stutter he started to doing mischievous things, started going back and forth to juvenile, behind me not being home, constantly working, and I wasn't there to guide him, keeping him out of trouble, and I wasn't there with the rest of the kids, the *older kids took care of the smaller kids* and the neighbors helped because I had to work in order to support them.

Q: About how many times would you say, if you can just give us in round numbers, that you know of your own knowledge, did your second husband beat William while he was a young boy?

A: Well, I don't know exactly how many times, because it's been a little while back, but severe whippings I do know at least about three times, because he had scars from a belt buckle that he had whipped him, what the disagreement was I don't know, because I wasn't at home and the children would tell me one thing when I got home and he tells me another. This caused William to constantly, when I talked to him, "Why you do this?"

MR. WHISNANT: I object to what it caused him to do, that's speculation on her part.

THE COURT: That's correct, Mr. Sanders, she can't give her opinion as to what was in his mind.

MR. SANDERS: May she continue?

THE COURT: I would suggest, Mr. Sanders, that you ask her questions and let her respond to them. I don't believe it's the purpose any witness, under the prevailing rules of evidence, that they can just get up and make a speech. So, you might—I'll allow you to lead her somewhat within reasonable bounds, but questions and answers is the proper procedure.

der was outrageously or wantonly vile, horrible and inhuman in that it involved depravity of mind to the victim." Although depravity of mind is a component of subsection (b)(7), the jurors were not instructed on it at the pre-sentence hearing.

On initial review of Brooks's death sentence, the Georgia Supreme Court upheld the finding as being supported "by sufficient evidence." *Brooks v. State,* 261 S.E.2d at 387. We agree with this assessment. Subsection (b)(7) must not be applied in a manner which is constitutionally vague. *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Here, the jury instruction, and its application, were not vague. Although the jury returned a finding using language not given in the original charge, the finding is based on the statute. No overbroad construction of the subsection (b)(7) aggravating circumstances is present in this case.

IX. Jury Instruction Burden-Shifting

 Brooks argues that the jury instructions given during the guilt phase of the trial relating to malice and intent were impermissibly burden-shifting. The trial court instructed the jury:

> The law, ladies and gentlemen, presumes every homicide to be malicious until the contrary appears from the circumstances of alleviation, excuse or justification, and it is incumbent upon the accused to make out such circumstance to your satisfaction unless they appear from the evidence produced against him.

The trial court also informed the jurors that "criminal intent ... [is] an essential element of every crime."

The Supreme Court has held that under the due process clause of the fourteenth amendment the state is required to prove the elements of murder beyond a reasonable doubt. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). The state habeas corpus court, upon reviewing Brooks's petition, agreed that the jury instruction impermissibly shifted the burden of proof from the prosecution to Brooks. The state

habeas corpus court, however, went on to state that although "there is no question that the charges are erroneous under present law," it could not grant Brooks relief because it was uncertain whether *Sandstrom* could be given retroactive effect. *Brooks v. Zant,* No. 5142, slip op. at 16 (Superior Court of Butts County, Georgia, Feb. 2, 1982). The state habeas corpus court, although recognizing the possible constitutional harm inherent in burden-shifting jury instructions, failed to realize that it was unnecessary to decide whether to apply *Sandstrom.* The holding of *Mullaney* (decided in 1975), is applicable without need for retroactive effect.

*Sandstrom* left unresolved the question of whether a jury charge which either created a conclusive presumption or improperly shifted the burden of proof could ever be harmless. Different circuits resolved the question in different ways. *See Lamb v. Jernigan,* 683 F.2d 1332, 1341 (11th Cir. 1982) (a burden-shifting jury instruction does not necessitate setting aside a defendant's conviction and sentence if the instruction is found to be harmless beyond a reasonable doubt); *Dietz v. Solem,* 640 F.2d 126, 131 (8th Cir.1981) (it is probable that a burden-shifting or conclusive presumption jury instruction is constitutional error in and of itself so that it is unlikely that that jury instruction can ever be harmless); *McGuinn v. Crist,* 657 F.2d 1107, 1108–1109 (9th Cir.1981), *cert. denied* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982) (erroneous *Sandstrom* violation jury instruction going to the issue of intent is harmless error when intent was not an issue in the case).

In *Connecticut v. Johnson,* —— U.S. ——, ——, 103 S.Ct. 969, 976, 74 L.Ed.2d 823, 832 (1983), the Supreme Court recently held by plurality that a conclusive presumption jury instruction on the issue of intent is the equivalent of a directed verdict on the issue. Four justices held that, barring certain exceptions, a *Sandstrom* violation can never be harmless error. —— U.S. at ——, 103 S.Ct. at 978, 74 L.Ed. at 835. Conversely, Justice Stevens, the swing vote needed for the plurality, held in his concurring

opinion that if the violation was less grievous, a harmless error determination could be made. —— U.S. at ——, 103 S.Ct. at 978, 74 L.Ed. at 835. Accordingly, a plurality of the *Connecticut v. Johnson* Court has refused to disallow the harmless error exception to the *Sandstrom* violation. The harmless error standard articulated by the Eleventh Circuit in *Jernigan* still stands.

The Eleventh Circuit held that a jury instruction stating that "the law presumes that every homicide is malicious until the contrary appears from circumstances of alleviation, excuse or justification," shifted the burden of proof to the defendant. *Jernigan*, 683 F.2d at 1341. The court recognized, however, that although an erroneous instruction pertains to an element of the crime at issue at the trial, it is still harmless if the evidence of guilt is so overwhelming that the error can not have contributed to the jury's decision to convict. *Jernigan*, 683 F.2d at 1342; *Mason v. Balkcom*, 669 F.2d 222, 227 (5th Cir.1982).

In this case, Brooks was identified by several witnesses as driving in the automobile with Carol Galloway; his fingerprints were found on the automobile; he gave police a confession in which he admitted kidnapping, raping, robbing, and killing Galloway. We hold that in this case the evidence of guilt is overwhelming. We also hold that the jury instruction, although burden-shifting, constitutes harmless error.

## X. Jury Exclusion

Brooks asserts that two jurors, Mary Holmes and Paul Nix, were impermissibly excluded from participation on the jury because of their opposition to the death penalty. Brooks asserts that this was done in contravention of *Witherspoon v. Illinois*, 391 U.S. 510, 522–23, 88 S.Ct. 1770, 1776–77, 20 L.Ed.2d 776 (1968). In *Witherspoon,* the Supreme Court held that jurors could be excluded because of their opposition to the death penalty only if they made "unmistakably clear" (1) that they would automatically vote against the imposition of capital punishment, or (2) that their attitudes would prevent them from making an impartial determination. 391 U.S. at 522 n. 21, 88 S.Ct. at 1777 n. 21.

We find no merit in this contention. Although both jurors answered in the negative to the question, "Are you conscientiously opposed to the death penalty?", their subsequent answers revealed that they were in fact conscientiously opposed to the death penalty. It is entirely possible that the juror misunderstood the meaning of the word "conscientiously." In any event, there is no doubt that both jurors would refuse to vote for the death penalty under any circumstance.[8] Their exclusion, with-

---

**8.** During voir dire examination, juror Mary Holmes states that she was not conscientiously opposed to the death penalty, but stated that she could not vote for the death penalty under any circumstances:

Q: All right, are you conscientiously opposed to the death penalty?
A: No, sir.
Q: All right, if you are selected to serve on this jury, and the defendant was found guilty of murder, would you consider the death penalty as one of the possible penalties and vote for it, if in your opinion the facts and circumstances of this case authorize the death penalty?
A: No, sir.
Q: You couldn't vote for the death penalty?
A: No, sir.
Q: Ma'am?
A: No, sir.
Q: Are you saying that if you are selected to serve on this jury, that you would refuse to vote for the death penalty no matter

what the facts and circumstances of this case were?
A: Yes, sir.

Juror Paul Nix also denied being conscientiously opposed to the death penalty at the same time that he stated he could vote for it under no circumstances:

Q: Are you conscientiously opposed to the death penalty?
A: No, sir.
Q: If you were selected to serve on this jury, and the defendant was found guilty of murder, and it became time to impose a sentence, would you consider the death penalty as one of the possible penalties and vote to impose it, if in your opinion the facts and circumstances authorized the death penalty, or warrant the death penalty?
A: No, sir.
Q: If you were selected to serve on this jury, and the defendant was found guilty of murder, and it became time to impose a sentence, would you consider the death

out objection of defense counsel, is not impermissible nor is it in contravention of the principles established in *Witherspoon.*

### XI. District Court Denial of Evidentiary Hearing

 Brooks alleges that the district court erred in refusing to grant him an evidentiary hearing to develop material facts crucial to the resolution of his claims. Brooks contends that he has witnesses which he could not present before because of financial considerations, and that he has facts to develop in support of his contention that cognizable classes of citizens, especially blacks, were systematically underrepresented in the grand jury pools in Muscogee County. While recognizing that Brooks may have facts which he feels would benefit his case, that is not the standard by which we judge the granting of an evidentiary hearing. A state court's written factual findings are presumed correct for purposes of habeas corpus relief unless one of the section 2254(d) exceptions is applicable. *Sumner v. Mata,* 449 U.S. 539, 545–46, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981). None of the exceptions is applicable here. Brooks participated in the hearing at the state habeas corpus proceeding, presenting evidence in his behalf. He was given an opportunity to be heard. When a state court has afforded a petitioner a full and fair evidentiary hearing on all legitimate facts and issues, a federal district court is not required to conduct an evidentiary hearing. *Hance,* 696 F.2d at 957. The district court correctly concluded that Brooks had a full and fair evidentiary hearing at the state level; it did not err in failing to grant an evidentiary hearing.

> penalty as one of the possible penalties and vote to impose it, if in your opinion the facts and circumstances authorized the death penalty, or warrant the death penalty?
> A: No, I wouldn't think so.
> Q: You couldn't vote for the death penalty?
> A: Oh, yeah, I could vote for it.
> Q: You misunderstood my question then. I said, after he's found—assuming that he is found guilty of murder, and it came time to fix the sentence, and the two possible sentences, one is death in the electric chair and one is life imprison-

### CONCLUSION

Accordingly, we hold (1) that the trial court properly declined to grant a change of venue; (2) that prosecutorial misconduct in the sentencing phase of the trial was sufficient to deny Brooks a full and impartial sentencing hearing; (3) that there was no error in the introduction of aggravating evidence; (4) that the trial court did not impermissibly restrict the admission of mitigating evidence at the sentencing phase of trial; (5) that the instructions of the trial court were not overbroad in contravention of the eighth and fourteenth amendments; (6) that although the instructions shifted the burden in proving an essential element of the crimes, the evidence of guilt was so overwhelming that the instruction was harmless beyond a reasonable doubt; (7) that jurors were not improperly excluded from participation because of their opposition to the death penalty; and (8) that the district court properly declined to grant an evidentiary hearing. Because of gross prosecutorial misconduct during the sentencing phase of Brooks's trial, his death sentence must be vacated. This case is remanded to the district court with instructions that the State of Georgia determine whether (1) to conduct a new sentencing hearing, or (2) vacate Brooks's death sentence and impose a sentence less than death in accordance with state law.

REVERSED and REMANDED FOR FURTHER PROCEEDINGS.

> ment, would you consider the death penalty and vote for it, if in you opinion the facts in this case authorized you giving the death penalty?
> A: No, sir.
> Q: You couldn't ever vote for the death penalty under any circumstances?
> A: I wouldn't think so, no.
> THE COURT: In other words, you're opposed to the death penalty?
> A: Yes, sir.
> Q: No matter what the facts and circumstances are?
> A: Yes, sir.