Richard TUCKER, Petitioner-Appellant,

v.

Robert FRANCIS, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.

No. 83–8466.

United States Court of Appeals, Eleventh Circuit.

Jan. 16, 1984.

Opinion on Denial of Rehearing and Rehearing En Banc
March 15, 1984.

Joseph M. Nursey, Atlanta, Ga., Kenneth Rose, for petitioner-appellant.

Susan V. Boleyn, Asst. Atty. Gen., Atlanta, Ga., for respondent-appellee.

Before TJOFLAT and FAY, Circuit Judges, and WISDOM *, Senior Circuit Judge.

FAY, Circuit Judge:

Appellant, Richard Tucker, was convicted of murder and kidnapping in the Superior Court of Bibb County, Georgia. He received two sentences of death. After exhausting his state direct appeal and habeas remedies, appellant filed this petition for writ of habeas corpus in the district court for the Middle District of Georgia. The district court denied relief and this appeal followed. We find error during the sentencing phase of appellant's capital trial and therefore reverse and remand this case for a new sentencing hearing.

Appellant raises six issues:

1. Whether the prosecutor's inflammatory, prejudicial closing argument during the sentencing phase violated appellant's right to a fundamentally fair trial and led to an arbitrary and capricious infliction of a death sentence.

2. Whether the prosecutor's comment on appellant's silence violated appellant's rights under the fifth, eighth and fourteenth amendments to the United States Constitution.

3. Whether trial counsel's failure to investigate or prepare for trial denied appellant his right to effective assistance of counsel.

4. Whether the trial court's instruction on the element of intent shifted the burden of persuasion to appellant in violation of his due process rights under *Sandstrom v. Mon-*

* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designa-

tion.

*tana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).

5. Whether the trial court's failure to instruct the jury on the law of confessions, required under state law, together with the admission of contradictory, disputed and uncounseled confessions, violated appellant's rights under the fifth, sixth, eighth and fourteenth amendments to the United States Constitution.

6. Whether appellant was denied his right to an evidentiary hearing in the court below.

### I. PROCEDURAL HISTORY

After appellant was convicted of murder he appealed to the Georgia Supreme Court. His conviction was affirmed, *Tucker v. State,* 245 Ga. 68, 263 S.E.2d 109 (1980), and the United States Supreme Court denied *certiorari* in *Tucker v. Georgia,* 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980).

In May of 1981, appellant filed a habeas corpus petition in the Superior Court of Butts County, Georgia, which was denied. A second habeas corpus petition in that same court was denied in January, 1982. The United States Supreme Court again denied *certiorari* on October 12, 1982. *Tucker v. Zant,* 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982).

This petition for habeas corpus relief was filed in the district court on November 15, 1982. The case was referred to a magistrate who entered proposed findings of fact and conclusions of law to which appellant objected. The district court adopted the magistrate's proposed order and issued probable cause to appeal and permission to proceed *in forma pauperis* on June 24, 1983.

The victim in this case was kidnapped from a hospital parking lot and forced to drive to a secluded area. The victim, a fifty-year-old woman, was robbed and clubbed to death with an iron pipe. Her body was then stripped of all clothing and the clothing was burned. The partially decomposed body was not discovered until five days after the murder. The relevant facts of this case will be introduced as needed in discussion of the issues raised.

### II. THE PROSECUTOR'S CONDUCT DURING CLOSING ARGUMENT IN THE SENTENCING PHASE OF APPELLANT'S CAPITAL TRIAL

The Georgia legislature has chosen to segregate the jury's determination of guilt from its punishment recommendation in capital cases. After the jury finds a defendant guilty of a capital offense, a sentencing hearing is conducted during which the same jury evaluates the aggravating and mitigating circumstances pursuant to Ga.Code Ann. §§ 17–10–31 & 17–10–2(b) (1982) and imposes a sentence of death or life imprisonment. In this case, the appellant alleges prosecutorial misconduct during the sentencing hearing of his capital trial. If error is found, it will require a new trial only on the issue of punishment. *Hance v. Zant,* 696 F.2d 940, 950 (11th Cir. 1983); *Miller v. State,* 237 Ga. 557, 229 S.E.2d 376, 377 (1976).

The constitutional right to a fundamentally fair trial prevents the prosecutor from urging a jury to impose a sentence of death for improper or irrelevant reasons. *Brooks v. Francis,* 716 F.2d 780 (11th Cir. 1983); *Hance,* 696 F.2d at 951.

This court has recently had two occasions to evaluate the manner in which some Georgia prosecutors argue for a death penalty during the sentencing hearing in a capital trial. In *Hance,* the Georgia prosecutor employed impermissible stratagems to persuade the jury to recommend death. In *Brooks,* many of the same unprofessional arguments caused us to remand the case for a new sentencing hearing. In this case, the prosecutor's closing argument employed many of the same tactics as well as additional egregious stratagems. We detail the errors we find in the closing argument in this case to help Georgia prosecutors to better understand the constitutional bounds of their advocacy.

#### (a) *The Standard Prison Guard Argument*

In *Hance,* the prosecutor argued that the death penalty was appropriate to protect prison guards:

What about those prison guards who have to guard him? What about their wives and families when he thinks no more of human life than what we know he thinks, when he's already proved he will kill, that he completely disregards human life, what about them, what about their families? You're going to subject those people to him for the next fifty years of his life?

696 F.2d at 952.

In this case the prosecutor perfected this emotional tactic:

If he had access to a weapon, would he kill today? He said before that he killed and he enjoyed it, and he would kill again. You heard Mr. Sagnikene say that he hated the guards at Reidsville. Is he going to kill one of them if we let him go down to Reidsville and spent [sic] the rest of his life there? (T.Tr. at 896–97).

\* \* \* \* \* \*

You're afraid of putting this man to death? Let the next victim of Richard Tucker be on your conscience. Let some prison guard, fifty-five years old, been working for twenty years at Reidsville— let some poor prison guard down there who can't carry a weapon because these people down there will grab it and use his weapon against him—let some prison guard down there who is right now on the job thinking about his pension, thinking about retiring in a few years—.

(T.Tr. at 898–99).

(b) *Protection of Young Prisoners*

The possible harm that the defendant would inflict on younger prisoners was raised in *Hance.* (696 F.2d at 952). Here, it was phrased as follows:

When we send Richard Tucker [to prison] tomorrow, our own time bomb—our own Bibb County time bomb sitting in the courtroom today, we set him loose on a prison guard or we set him loose on some twenty-year old kid who is serving a burglary sentence down there, who does have a chance for rehabilitation, who does have a future in our society, who can come back out. (T.Tr. at 899).

Both of these statements direct the jury's attention away from the task of imposing a sentence for the individual. Conjuring up images of possible murders of prison guards and inmates is inappropriate. As we stated in *Brooks,* "[s]entences should be imposed upon the 'individual' found guilty of committing the crime charged." 716 F.2d at 790. The effect of a sentence on the individual is the relevant consideration, not its effect on third persons.

(c) *Allegation of Sexual Assault*

The victim in this case was a fifty year old woman. Her naked body was found so long after death that it was medically impossible to determine if she had been sexually assaulted, therefore, the defendant was not charged with sexual assault. The Georgia Supreme Court found that there was no real issue of sexual assault. The evidence on the rape issue was so unsubstantial that had rape been charged a directed verdict would have been proper. *Tucker v. State,* 245 Ga. 68, 69, 263 S.E.2d 109, 110 (1980). Nonetheless, the Georgia prosecutor suggested to the jury that sexual assault be considered:

During the course of the main case there was not a great deal of evidence that you could consider about whether or not Mrs. Sandefur was sexually assaulted, but additional things have come in since that time and I think that you can consider the fact that she was unclothed and the fact that he says at one point she was on her knees. I think you can consider—I think consider this history right here: On the 25th day of December, 1964, Christmas Day, Richard Tucker did unlawfully and with force and arms feloniously break and enter into the dwelling house of Catherine Jackson with intent to commit a felony, to wit: rape. I think you can consider the medium brown pubic hair that was found on his clothing, and I think in your own mind you should be settled that this Defendant not only killed Edna Sandefur—and I hate to say this with the family sitting in the courtroom because I know they don't want to believe this; they don't want to believe

the type of punishment that this Defendant imposed on their mother or their wife—but I think in your own mind you should be settled now by knowing that this man is a rapist and a murderer, that he forced Mrs. Sandefur to commit acts of oral sodomy on him and that he committed the offense of rape. That's the reason she was unclothed, not this nonsense about fingerprints on clothing.

T.Tr. at 892–93.

The suggestion of possible rape in these circumstances is not a basis upon which the death penalty may be imposed. This is the most flagrant violation of the *Hance* and *Brooks* prohibition of improper argument. It has no place in a sentencing hearing that holds a man's life in the balance. Rape was not an issue, had not been charged, was not proved and should not have been injected into the trial.

### (d) *Possible Subsequent Release by Parole and Probation Board*

On this issue the prosecutor injected his personal opinions by speculating that a life sentence would result in the defendant's parole and the consequences of his later release:

Can we afford—Can you afford as a jury and as a citizen to take the chance if you impose a life sentence on this Defendant? Can we afford to take the chance that some day thirteen years or so from now when a Pardon and Parole Board looks at this Defendant and says, "Well, he hasn't killed anybody in thirteen years." At that time he will be somewhere in his forties, and that Pardon and Parole Board says, "Well, he's doing all right. Let's let him out again." Are you going to feel safe on the streets? Are you?

It scares me every time I get a letter from the Pardon and Parole Board. "We're considering Richard Tucker for parole." It scared me so badly I wrote a two page letter. You know what? They let him out anyway. That's why you have an interest in this case. That's why you as a juror, Ms. Brooks, Ms. Jones, you individually and you collectively have an interest in this case and that is to protect society against Richard Tucker.

T.Tr. at 900.

A prosecutor is only that. It is improper to critically speculate on the future actions of a parole commission, which is an independent body in the criminal justice process. Georgia law prohibits argument on the issue of parole, Ga.Code Ann. § 17–8–76 (1982). These inflammatory statements were improper.

We noted in *Brooks* that prosecutors can be zealous in their advocacy. 716 F.2d at 780. We only urge that their zeal be contained to constitutional means. The law will be served only when the death penalty is imposed for legally mandated reasons. The evidence in this case supports strong argument concerning the horrible crime committed. Prosecutors may comment upon the details of such conduct but must not speculate on unrelated matters. In this case, the prosecutor's closing argument was a speculative parade of horrors that had little to do with aiding the jury in deciding whether to sentence Richard Tucker to death. We find that the argument as a whole denied appellant a fundamentally fair sentencing proceeding.

### III. PROSECUTORIAL COMMENT ON THE APPELLANT'S INITIAL FAILURE TO TESTIFY

Richard Tucker elected not to testify during the culpability phase of his trial. Based on substantial evidence, including confessions made by the appellant, the jury found him guilty of murder. Pursuant to Georgia's bifurcated capital trial procedure, a sentencing hearing was held during which evidence was introduced to aid the jury in choosing between a sentence of death or life in prison. During this hearing the appellant decided to testify on his own behalf.

The appellant's testimony during the sentencing hearing was substantially more than a plea for mercy. It directly refuted evidence introduced during the culpability phase of his trial. He stated that an earlier admission given to the police was not true and he then explained to the jury his version of how the murder occurred. Specif-

ically, according to Mr. Tucker, he was not the murderer but rather he had played only a minor role while under the influence of both drugs and alcohol. T.Tr. at 805–37.

During closing argument to the sentencing phase of the trial, the prosecutor commented upon the appellant's earlier silence at the culpability phase and his testimony during the sentencing proceedings:

Well, why then did this defendant all of a sudden in this state of the trial get on the stand and start telling you these lies that he's told you—or told you yesterday? It's very simple. The defense is playing games with you. They knew and this Defendant knew that the evidence in this case was strong on the issue of his guilt, and there was really no point in him testifying in the first stage of this trial to try to convince you that he was innocent and that Punch MaHone killed Mrs. Sandefur; he knew that. So, what does he try to do? He tries to confuse you by getting up at this stage of the trial and trying to convince you or plant some little bit of doubt in your mind that he acted alone. And, why would he do that? ...

(T.Tr. at 894).

The appellant now alleges that the prosecutor's comment on his earlier silence infringes upon his fifth amendment right to remain silent.

We must emphasize that the prosecutor's comment did not occur during the culpability portion of the trial. It was only after the appellant elected to testify during sentencing that the prosecutor mentioned the appellant's earlier silence. The prosecutor's comment occurred *after* the jury had found the appellant guilty of murder and *after* the appellant had testified, but before the jury returned its sentence.

Appellant relies on *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Griffin chose not to testify during the culpability portion of his bifurcated capital trial, but he did testify at the sentencing hearing. The trial judge in *Griffin* instructed the jury that it was permissible

to draw unfavorable inferences from the defendant's failure to testify. The prosecutor's comment and the judge's instruction were on the issue of guilt and occurred before the jury reached its verdict.[1] The Court held that it is unconstitutional for the prosecutor to comment on the defendant's silence during trial by suggesting an inference of guilt from the defendant's failure to testify in refutation of facts within his knowledge.

The *Griffin* circumstances are similar to those of the instant case, however, two salient facts are different. First, in addition to the prosecutor's comment the court instructed the jury that it could make unfavorable inferences from the defendant's silence. In the instant case, the prosecutor's comment was not designed to suggest an inference of guilt, for guilt had already been determined but rather the prosecutor's comment was intended to impeach the appellant's credibility. Second, in *Griffin,* the comment and instruction occurred during the culpability phase of the capital trial and before the defendant testified at the presentence hearing. Here, the prosecutor's comment occurred after guilt had been determined and after the defendant had voluntarily testified during the sentencing hearing. *Griffin* therefore does not answer the issue in this appeal.

Petitioner also relies on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In *Smith,* a pre-trial psychiatric examination, conducted without advising the defendant of his fifth amendment rights was introduced during the sentencing portion of the capital trial to show the defendant's dangerousness. The Court established that the fifth amendment applies to the sentencing phase of a capital trial and therefore excluded the evidence gathered in violation of the fifth amendment. For fifth amendment purposes the Court could "discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial." *Id.* at 462, 101 S.Ct. at 1873.

---

1. Brief of Petitioner at 5–6, *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

*Smith* applies the fifth amendment to jury sentencing proceedings and *Griffin* prohibits prosecutors from commenting during the culpability phase on a defendant's silence to suggest an inference of guilt. Yet, these two principles do not resolve the issue in this case. Therefore, we must examine more fully the fifth amendment doctrine to decide if it prevents the prosecutor from commenting during closing argument in the sentencing phase on the appellant's silence during the culpability phase of his capital trial when the defendant has testified in the sentencing phase only.

The Supreme Court has addressed many circumstances in which the defendant's earlier silence was sought to be introduced at trial. These cases focus on two factors: whether this silence is probative as an evidentiary matter and whether introduction of the earlier silence violates the defendant's fifth amendment privilege against compelled self-incrimination. In this case we must determine if Richard Tucker's silence during the culpability portion of his trial is a sound evidentiary basis to impeach his sentencing testimony and, if so, whether the prosecutor's comment nonetheless violates appellant's fifth amendment privilege. Constitutional challenges to impeachment with prior silence are analyzed by examining the probative value of the silence as well as the scope of the defendant's testimonial waiver. Finally, we must balance the broader question of the competing interests of the defendant in not incurring comment on prior invocation of the fifth amendment and the interests of truth seeking through the traditional adversarial tests. Because the constitutional issues are largely resolved by the probative value determination, our discussion in this section will repeatedly examine the probative value of the prior silence in the different subsections.

Was Appellant's Silence Probative of his Credibility?

■ It is impermissible to use a defendant's *post*-arrest silence to impeach him on cross examination, *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); however, it is permissible for a prosecutor to comment during closing argument on a defendant's *prearrest* silence. *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 56 (1980). The difference between these two decisions is explained by the evidentiary value of the silence.

The Supreme Court recognizes that "[f]ailure to contest an assertion [silence] ... is considered evidence of acquiescence ... if it would have been natural under the circumstances to object to the assertion in question." *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975).[2] Richard Tucker remained silent throughout the culpability phase of his capital murder trial. He invoked his fifth amendment privilege while the state established sufficient facts to lead a jury to convict the appellant of murder. It is hard to imagine a more compelling instance in which it would be natural to respond to facts and accusations. If a capital defendant has exonerating proof it is natural to testify to those facts. It is unnatural for a defendant to wait until convicted of murder to testify to his version of the facts. As the state prosecutor noted, why did appellant not produce this version of the facts earlier. Knowing the probable consequences of a murder conviction, the defendant's failure to testify during the culpability determination logically impeaches his sentencing hearing testimony to an exonerating version of the facts. The Court has consistently recognized that in proper circumstances, silence in the face of accusations is probative of acquiescence.[3] Richard Tucker's si-

**2.** *See* 3A J. Wigmore, Evidence § 1042 (J. Chadbourn rev. 1970) *quoted in Baxter v. Palmigiano,* 425 U.S. 308, 319, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821 (1976); *United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99 (1975) (failure to take the stand when it would have been natural to do so is a form of impeachment by silence).

**3.** *See* e.g. *Grunewald v. United States,* 353 U.S. 391, 418–424, 77 S.Ct. 963, 981–984, 1 L.Ed.2d 931 (1957); *Adamson v. California,* 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947); *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221, 224 (1923); *Twining v. New Jersey,* 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908); *United States v. Fairchild,* 505 F.2d 1378 (5th Cir.1975).

lence during the culpability determination is relevant to impeaching his sentencing testimony in which he sought to establish a new version of the facts.

In only one case, *Doyle v. Ohio, supra,* did the Supreme Court find that impeachment by silence violated the Constitution. The other decisions on the impeachment use of prior silence have turned on whether the silence is probative of impeaching the defendant's credibility and what prejudice might result. *See Jenkins v. Anderson,* 447 U.S. at 239, 100 S.Ct. at 2129–2130; *United States v. Hale,* 422 U.S. 171, 180–81, 95 S.Ct. 2133, 2138–39, 45 L.Ed.2d 99, 104 (1975); *Stewart v. United States,* 366 U.S. 1, 5, 81 S.Ct. 941, 944, 6 L.Ed.2d 84, 88 (1961); *Grunewald v. United States,* 353 U.S. 391, 424, 77 S.Ct. 963, 984, 1 L.Ed.2d 931, 954 (1957). *Doyle* was decided on due process grounds. 426 U.S. at 619–620, 96 S.Ct. at 2245–2246. The Court found that the implicit assurance in *Miranda* warnings, that silence will not be used against one, made it fundamentally unfair to use a defendant's post-arrest silence at trial. The Court held that silence at arrest, even when seemingly inconsistent with trial testimony, is not probative of acquiescence to the government's case. *Id.* at 617, 96 S.Ct. at 2244. The reasoning of *United States v. Hale,* was invoked:

> At the time of arrest and during custodial interrogation, innocent and guilty alike—perhaps particularly the innocent—may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply.... He may have

maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention....

> Respondent, for example, had just been given the *Miranda* warnings and was particularly aware of his right to remain silent and the fact that anything he said could be used against him. Under these circumstances, his failure to offer an explanation during the custodial interrogation can as easily be taken to indicate reliance on the right to remain silent as to support an inference that the explanatory testimony was a later fabrication. There is simply nothing to indicate which interpretation is more probably correct.

422 U.S. at 177, 95 S.Ct. at 2137 (citations omitted).

The due process rationale of *Doyle* is not applicable here. Unlike the Court in *Doyle,* we conclude that the silence in this case was probative of the appellant's credibility. Subsequent to *Doyle,* the Court has held that due process is not offended by commenting upon the defendant's failure to state a fact "in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson,* 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1979). It is not fundamentally unfair to comment on the appellant's silence during the culpability phase as juxtaposed with his exculpatory testimony during the sentencing phase. A defendant is usually told that so long as he does not testify, his failure to testify will not be used against him.[4] In this case, Richard Tucker's failure to testify was not used against him during that portion of his trial in which he invoked the fifth amend-

---

4. The fundamental fairness principle that may prevent the impeachment use of prior silence is illustrated in *Johnson v. United States,* 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1942). In *Johnson* the defendant voluntarily testified. On cross examination the court ruled that the defendant could refuse to answer certain questions by invoking the fifth amendment privilege. In reliance on the court's ruling the defendant refused to answer certain questions on cross examination and the prosecutor com-

mented on that refusal. The Supreme Court held "elementary fairness" requires that an accused shall not be misled. The defendant had the right to rely on the trial court's ruling and therefore had an expectation of no adverse comment. This principle does not apply to the instant case as appellant did not rely on an expectation of no comment after he waived his privilege and testified. Thus at the time of the comment appellant could have no reasonable expectation of no comment.

ment. After he waived his fifth amendment privilege by testifying, any expectations of protection from adverse comment also were waived.

Does the Prosecutor's Comment Overly Burden Appellant's Fifth Amendment Privilege?

In *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926) the defendant was re-tried after the first jury deadlocked. At the second trial the defendant chose to testify. The Court held the fifth amendment does not bar impeaching the defendant on cross examination with questions about his silence during the first trial. The *Raffel* fifth amendment discussion rests on two bases: waiver and relevancy in light of the facts of the case. Thus, once again probative value is examined.

Raffel was charged with conspiracy to violate the National Prohibition Act. At both the first and second trial a prohibition agent testified that at the time of arrest Raffel admitted he owned the "drinking place." The defendant did not refute this evidence at the first trial but he did take the witness stand at the second trial to deny having made the statement. Under the *Raffel* facts it would have been natural for the defendant to deny having made this statement. Raffel's earlier silence was a valid basis for impeaching his subsequent testimony.[5]

The facts of *Raffel* are close to those of the instant case. *Raffel* established that the earlier silence is probative of the defendant's credibility and that impeachment with it does not violate the Constitution. Thus, appellant's failure to testify at the culpability phase of his trial was a proper basis for impeaching his later testimony. The earlier silence here, as in *Raffel* was probative of the appellant's credibility as it would have been natural to speak out when guilt was being determined.

The *Raffel* decision and subsequent cases have emphasized the probative value of the impeaching silence as the distinguishing factor in determining if the impeachment use of prior silence violates the fifth amendment. This is demonstrated by comparing *Raffel* to *Stewart v. United States,* 366 U.S. 1, 81 S.Ct. 941, 6 L.Ed.2d 84 (1961). In *Stewart,* the defendant was tried twice and twice convicted and sentenced to death. He remained silent at his first two trials, which were reversed due to unrelated, errors and then decided to testify at the third trial to further his insanity plea. His testimony was described as "gibberish without meaning." *Id.* at 3, 81 S.Ct. at 942. On cross examination the prosecutor questioned Stewart about his earlier silence. The Supreme Court held that this was impermissible. Stewart's testimony was only to the issue of insanity. His earlier silence therefore was not probative of acquiescence. *Hale, supra,* discussed the probative difference:

> Silence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation. Failure to contest an assertion, however, is considered evidence of acquiescence only if it would have been natural under the circumstances to object to the assertion in question. 3A Wigmore § 1042. The *Raffel* Court found that the circumstances of the earlier confrontation naturally called for a reply. Accordingly, the Court held that evidence of the prior silence of the accused was admissible.

422 U.S. at 176, 95 S.Ct. at 2136.

In *Stewart* the defendant only testified at the third trial to show his insanity. It is not possible to draw any logical inference from the earlier silence. Stewart's testimony did not refute any of the state's case and only went to demonstrating his insanity. The instant case is more like *Raffel.* During the culpability portion of appellant's

---

**5.** Although the interpretation of *Raffel* appears to conflict with *Doyle, supra,* Justice Marshall, dissenting to *Jenkins v. Anderson,* observed that "[i]n effect, the Court limited *Raffel* to cases in which the probative value of the cross-

examination outweighed its possible impermissible effect on the jury." 447 U.S. at 242, 100 S.Ct. at 2131 *citing Grunewald v. United States,* 353 U.S. at 420–21, 77 S.Ct. at 981–982.

trial he remained silent while the state introduced his confessions and proved him to be the murderer.

In *Jenkins v. Anderson, supra,* the Court discussed the burden on the fifth amendment privilege from permitting comment on pre-arrest silence. The Court relied on *Raffel,* noting that in *Raffel* the defendant's election not to testify at the first trial was an invocation of his fifth amendment privilege. The Court stated that *Raffel* permits impeachment with prior silence even though that silence was an invocation

of the fifth amendment.[6] 447 U.S. at 236 n. 2, 237, 100 S.Ct. at 2128 n. 2, 2129. In *Jenkins* the Court held that impeachment with pre-arrest silence does not violate the fifth amendment if the silence is probative. The Court re-affirmed its conclusion in *Raffel* that impeachment with prior silence does not impermissibly burden the fifth amendment privilege. 447 U.S. at 237, 100 S.Ct. at 2128–2129. Based on the *Jenkins* statements about *Raffel,* we conclude that the prosecutor's comment did not impermissibly burden the appellant's fifth amendment privilege.[7]

---

**6.** In *Jenkins,* the majority of the Court breathed new vitality into the *Raffel* decision. 447 U.S. at 237 n. 4, 100 S.Ct. at 2128–2129 n. 4. Prior to *Jenkins,* some Supreme Court opinions had cast doubts upon the continued viability of the fifth amendment rationale in *Raffel. See, e.g., Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Grunewald v. United States,* 353 U.S. 391, 418, 425–26, 77 S.Ct. 963, 981, 984–985, 1 L.Ed.2d 931 (1957); *Johnson v. United States,* 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1942).

The majority in *Jenkins* relied on *Raffel* for its decision. In a footnote the majority addressed the question of the validity of *Raffel:*
Both MR. JUSTICE STEVENS, *post,* at 241–242, n. 2 [100 S.Ct. at 2131 n. 2], and MR. JUSTICE MARSHALL, *post,* at 252 [100 S.Ct. at 2136], suggest that the constitutional rule of *Raffel* was limited by later decisions of the Court. In fact, no Court opinion decided since *Raffel* has challenged its holding that the Fifth Amendment is not violated when a defendant is impeached on the basis of his prior silence. In *United States v. Hale,* 422 U.S. 171, 175, n. 4 [95 S.Ct. 2133, 2136, n. 4, 45 L.Ed.2d 99] (1975), the Court expressly declined to consider the constitutional question. The decision in *Stewart v. United States,* 366 U.S. 1 [81 S.Ct. 941, 6 L.Ed.2d 84] (1961), was based on federal evidentiary grounds, not on the Fifth Amendment. The Court in *Grunewald v. United States,* 353 U.S. 391, 421 [77 S.Ct. 963, 982, 1 L.Ed.2d 931] (1957), stated that it was not required to re-examine *Raffel.* In all three cases, the Court merely considered the question whether, as a matter of federal evidentiary law, prior silence was sufficiently inconsistent with present statements as to be admissible. 447 U.S. at 237 n. 4, 100 S.Ct. at 2128–2129.

**7.** In certain instances a defendant may testify at a preliminary proceeding without waiving his fifth amendment privilege and without risking subsequent impeachment by the earlier testimony. It is impermissible to use the defendant's testimony at a pre-trial suppression hearing against him at trial *on the issue of guilt.*

*Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). *Simmons* turned on the former standing requirements to assert a fourth amendment violation. In *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Court held it was impermissible to introduce evidence of the defendant's invocation of his fifth amendment privilege at a grand jury hearing. The silence was sought to show an inference of guilt. *Id.* at 419 n. 30, 77 S.Ct. at 981 n. 30 and the Court found it was not probative of guilt. *Id.* at 420–21, 77 S.Ct. at 982. Unlike these two cases, the prosecutor's comment here was designed to impeach the appellant's pre-sentencing testimony. It occurred after guilt had already been determined; it was therefore not possible that the jury could have drawn an adverse inference of culpability.

Generally, a waiver of the fifth amendment privilege against compelled self-incrimination must occur in the same proceeding. 8 J. Wigmore, Wigmore on Evidence § 2276(4) at 470 (McNaughton rev. 1961). The peculiar circumstance of Georgia's bifurcated capital trials present the question of whether waiver during the sentencing phase affects waiver of the privilege invoked during the guilt phase.

In *Griffin v. California, supra,* the Court loosely referred to California's bifurcated procedure as providing for "separate trials." 380 U.S. at 609, 85 S.Ct. at 1229. The California Penal Code (discussed in *Griffin* ) and the Georgia statutes do not contain such language. *See* California Penal Code § 190.1 (Deerings 1973) and Ga.Code Ann. § 17–10–2 (1982). In any event, our reading of the fifth amendment waiver precedents suggests that the waiver decision should not turn on a semantic nicety incidentally included or excluded from a statute. *Raffel* clearly held that the impeachment use of silence at an earlier trial was permissible. We hold that it is permissible to impeach the appellant at the sentencing phase with his silence during the culpability phase of the same trial. Our decision here rests also on our discussion of *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971),

**1514**

The Scope of Appellant's Waiver

■ Once a defendant chooses to testify,[8] "his credibility may be impeached and his testimony assailed like that of any other witness, and the breadth of his waiver is determined by the scope of relevant cross-examination. '[H]e has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.'" *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 626, 2 L.Ed.2d 589, 596–97 (1956) (citations omitted). Richard Tucker's testimony at the sentencing phase of his trial included an attempt to explain as inaccurate a confession made to the police and introduced at trial. His version of the facts had him playing a minor role, completely different from the facts on which the jury presumably relied to convict him of murder. Thus the scope of the appellant's waiver was complete and it was permissible to comment, for impeachment purposes, on his earlier silence.

■ In this circuit "when a defendant voluntarily testifies to the merits, and not just upon a purely collateral matter, the prosecutor may comment upon the defendant's failure to deny or explain incriminating facts already in evidence." *Calloway v. Wainwright,* 409 F.2d 59, 65 (5th Cir. 1968) *cert. denied,* 395 U.S. 909, 89 S.Ct. 1752, 23 L.Ed.2d 222 (1969) *quoted in, McGahee v. Massey,* 667 F.2d 1357 (11th Cir.1982), *cert. denied,* 459 U.S. 943, 103 S.Ct. 255, 74 L.Ed.2d 199 (1982). We are persuaded that the scope of the appellant's waiver was so broad as to allow the impeachment use of his earlier silence. We

need not address the quagmire of which matters are "collateral" in this case because it is clear that appellant's testimony went "to the merits." Although appellant's testimony during the sentencing hearing was more relevant to the already adjudicated guilt question, Georgia law permits this type of evidence during the sentencing phase of a capital trial. *Green v. State,* 242 Ga. 261, 249 S.E.2d 1 (1978) *rev'd on other grounds,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979). Had the appellant limited his presentence testimony to biographical mitigating factors this case might be susceptible of a "collateral matter" or partial waiver limitation; however, such are not our facts.

Forcing the Appellant to Make a Difficult Choice Between Constitutional Rights

We recognize our holding allows tension between the constitutional rights to remain silent and to be heard on the issue of punishment. This tension is not of itself unconstitutional. In *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) the Supreme Court held that a unitary capital trial, in which both guilt and sentence are determined by the jury in the same procedure and verdict, is constitutional. A unitary trial forces the defendant to make a difficult choice whether to remain silent on the issue of guilt at the cost of surrendering the opportunity to testify to the penalty issue. The Court rejected a bifurcation requirement, finding instead that the Constitution does not forbid requiring the defendant to choose between the fourteenth amendment right to be heard on the issue of punishment and the fifth amendment privilege to remain silent. *Id.* at 213, 91 S.Ct. at 1470.[9]

which suggests that a bifurcated procedure is still one trial.

8. We have no doubt that had the prosecutor's comment occurred during the final argument on the question of guilt this would have been error, as appellant had not yet waived his privilege. *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

9. A similar discussion of the tension between rights is in *Raffel:*

We need not close our eyes to the fact that every person accused of crime is under some pressure to testify, lest the jury, despite carefully framed instructions, draw an unfavora-

ble inference from his silence. When he does take the stand, he is under the same pressure: to testify fully, rather than avail himself of a partial immunity. And the accused at the second trial may well doubt whether the advantage lies with partial silence or with complete silence. Even if, on his first trial, he were to weigh the consequences of his failure to testify then, in the light of what might occur on a second trial, it would require delicate balances to enable him to say that the rule of partial immunity would make his burden less onerous than the rule that he may remain silent, or at his option, testify fully, explaining his previous silence. We are

Georgia's bifurcated capital trials[10] thus afford defendants an advantage, a lagniappe, beyond the constitutional requirements: a defendant may remain silent during the culpability portion of the trial and the fifth amendment will protect him from adverse comment or inference prior to a jury determination of guilt. If convicted, he may thereafter testify at the sentencing hearing without having to make the difficult choice discussed in *McGautha*.[11]

While "the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights,'" *Jenkins*, 447 U.S. at 236, 100 S.Ct. at 2128, *quoting Chaffin v. Stynchcombe*, 412 U.S. 17, 30, 93 S.Ct. 1977, 1986, 36 L.Ed.2d 714, 725 (1973) "[t]he 'threshold question is whether compelling the election impairs to an appreciable extent any of the policies behind the rights involved.'" *Jenkins*, 447 U.S. at 236, 100 S.Ct. at 2128, *citing Chaffin* at 32, 93 S.Ct. at 1985, *quoting Crampton v. Ohio, decided with McGautha v. California*, 402 U.S. at 213, 91 S.Ct. at 1470. The importance of the fifth amendment privilege against compelled self-incrimination is established. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The policies behind the privilege are not so clear. *See* J. Wigmore, 8 Wigmore on Evidence § 2251 (McNaughton rev. 1961). At a minimum, the privilege should prevent compulsory self-incrimination through overreaching by the state. *Couch v. United States*, 409 U.S. 322, 329, 93 S.Ct. 611, 616, 34 L.Ed.2d 548 (1973).[12] Our decision does not compromise the appellant's right not to be compelled to incriminate himself. His testimonial waiver was voluntary. Further, since the waiver and the prosecutor's comment occurred after guilt had been determined, it caused no adverse affect on the culpability determination.

In *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) the Court permitted the impeachment use of an earlier statement by the defendant taken in violation of *Miranda*. Rejecting the argument that this impeachment would violate fifth amendment principles the Court said:

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be

---

unable to see that the rule that if he testifies, he must testify fully, adds in any substantial manner to the inescapable embarrassment which the accused must experience in determining whether he shall testify or not. 271 U.S. at 499, 46 S.Ct. at 568 (citations omitted).

**10.** The Supreme Court has never expressed any doubt about the constitutionality of a bifurcated capital trial. *See McGautha v. California*, 402 U.S. 183, 196–208, 91 S.Ct. 1454, 1461–1467, 28 L.Ed.2d 711 (1971); *Witherspoon v. Illinois*, 391 U.S. 510, 519–520 n. 15, 88 S.Ct. 1770, 1775–1776 n. 5, 20 L.Ed.2d 776 (1968); *Spencer v. Texas*, 385 U.S. 554, 560, 87 S.Ct. 648, 651, 17 L.Ed.2d 606 (1967); *Giaccio v. Pennsylvania*, 382 U.S. 399, 405 n. 8, 86 S.Ct. 518, 522 n. 8, 15 L.Ed.2d 447 (1966).

In *Spencer v. Texas* the Court acknowledged that the states have always been afforded "wide leeway in dividing responsibility between judge and jury." 385 U.S. at 560, 87 S.Ct. at 657. When a jury is acting in a sentencing capacity it hears evidence and argument that would otherwise be kept from it. This process is valid.

**11.** The *McGautha* decision supports our holding of waiver in this case. *McGautha* assumed that testimony on the issue of punishment will waive the fifth amendment privilege as to all matters relevant to both culpability and punishment. That rationale obtains here. The appellant did not waive his privilege until he testified at the sentencing hearing but having done so the waiver is complete.

**12.** This policy is explained in *Murphy v. Waterfront Comm'n*, 378 U.S. 52, 55, 84 S.Ct. 1594, 1596–1597, 12 L.Ed.2d 678, 698 (1964):

[o]ur unwillingness to subject those suspected of crime to the cruel trilemma of self-accusation, perjury or contempt; our preference for an accusatorial rather than an inquisitorial system of criminal justice; our fear that self-incriminating statements will be elicited by inhumane treatment and abuses; our sense of fair play which dictates a fair state-individual balance by requiring the government . . . in its contest with the individual to shoulder the entire load, . . . our respect for the inviolability of the human personality and of the right to each individual to a private enclave where he may lead a private life . . .

construed to include the right to commit perjury.... Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process." 401 U.S. at 225, 91 S.Ct. at 645–646.

The Supreme Court has noted that the fifth amendment privilege against adverse comment on silence, "has little to do with a fair trial and derogates rather than improves the chances for accurate decisions." *Baxter v. Palmigiano,* 425 U.S. 308, 319, 96 S.Ct. 1551, 1558 (1976). We find that the appellant voluntarily waived his fifth amendment privilege and that waiver does not offend the policy against compelled self-incrimination. "Silence is often evidence of the most persuasive character". *United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221, 224 (1923). When, as here, there is no fifth amendment reason to exclude the earlier silence from impeaching a defendant who voluntarily waives the privilege, the interests of accurate factfinding will be served.[13]

> Once a defendant decides to testify, "[t]he interests of the other party and regard for the function of courts of justice to ascertain the truth become relevant, and prevail in the balance of considerations determining the scope and limits of the privilege against self-incrimination." *Brown v. United States,* 356 U.S. 148, 156, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958).

**13.** In Richard Tucker's trial the same jury determined both his guilt and his penalty. This is the usual practice in Georgia capital trials. This fact reduces the potential for adverse affect from the comment. Defense counsel himself in opening statement to the sentencing portion of the trial called the jury's attention to the appellant's initial failure to testify.

> [T]his is the stage in the case where we put up evidence and, frankly, try to influence the verdict that you're going to have to decide, that is whether to order Mr. Tucker executed or to grant him life imprisonment. That's up to you, so we expect to put some evidence up

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

■ Petitioner asserts that he was denied effective assistance of counsel at the preliminary proceedings, during the guilt determination and at sentencing. Trial counsel attempted to suppress the petitioner's confession. After losing the suppression motion, counsel admitted that any real defense was "out the window." This realistic assessment of petitioner's defense does not require that trial counsel be found ineffective. Counsel investigated the case and determined there was no viable defense. No defense witnesses were called to refute the petitioner's guilt. It is highly probable that no witnesses existed. We do not find that trial counsel was ineffective during the preliminary and culpability stages of the trial.

Petitioner contends there was ineffective assistance of counsel during sentencing because mitigating circumstances were not argued. We have already determined that petitioner is entitled to a new sentencing proceeding. On remand, the mitigating circumstances of emotional disturbance, and drug and alcohol intoxication can be argued and their merits assessed.

## V. PROPRIETY OF THE JURY INSTRUCTIONS

■ Petitioner posits that the jury instructions on intent impermissibly shifted the burden of persuasion and lessened the standard of proof under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). As in *Sandstrom,* criminal intent was the only real issue in this trial because the petitioner had admitted the act. The state must prove every element of the

at this particular time, and we're going to ask Mr. Tucker to take the witness stand and ask him some questions and have him explain to you and talk to you and answer questions about what happened and be quite candid with you and give his mitigation and extenuation of these crimes that you've convicted him of.

T.Tr. at 799.

We also note that our reading of the record does not disclose that defense counsel timely objected to the prosecutor's comment. The state does not argue waiver of the objection so we do not reach this issue.

crime charged. Intent was an essential element of the murder charge in this case. *See Lamb v. Jernigan,* 683 F.2d 1332, 1336 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496. In *Sandstrom* the erroneous instruction was "the law presumes that a person intends the ordinary consequences of his voluntary acts." 442 U.S. 512, 99 S.Ct. 2453. The Court found this instruction exceeded the permissive presumptions that can be established by state law because a "reasonable juror could have given the presumption a conclusive or persuasion-shifting effect." *Id.* at 519, 99 S.Ct. at 2456.

This court applied the *Sandstrom* standards in *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496. In *Lamb* we noted that the effect of a jury instruction should be gauged by examining the entire instruction, not just isolated words or phrases. *Id.* at 1339 *quoting Cupp v. Naughten,* 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). In *Lamb,* the court found that the following instruction "was not reasonably susceptible of an interpretation that relieved the prosecution of its burden of proving intent" (683 F.2d at 1340):

> Now, criminal intent, being an essential element of every crime, is a question of fact to be determined by you, ladies and gentlemen of the jury, whether such intent existed in the mind of this defendant at the time of the alleged crime.
>
> Intent may be shown in many ways, provided you find that it existed from the evidence produced before you during the trial of this case.
>
> It may be inferred, ladies and gentlemen, from proven circumstances or by the acts and conduct of the defendant or it may be presumed when it would be the natural and necessary consequences of the particular acts.
>
> Stated simply in laymans language, ladies and gentlemen, criminal intent means simply the intent to commit an act

which the laws of the State of Georgia prohibit and forbid.

*Id.* at 1337 n. 8.

The following instructions were given in this case:

> The acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted. A person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts, but the presumption may be rebutted. A person will not be presumed to act with criminal intention, but the trier of fact, that is you the Jury, may find such intention upon consideration of the words, conduct, demeanor, motive and all other circumstances connected with the act for which the accused is prosecuted. (T.Tr. at 769).

Like the instruction in *Lamb,* in the instant case the jury was told that as the factfinder it should evaluate the evidence of intent. This instruction similarly allowed the presumption that one intends the natural consequences of one's action. Despite this language we find this instruction was not unconstitutional under *Sandstrom.* The instruction repeatedly announces its own permissiveness. The final sentence brings home to the jury its factfinding role: "[a] person will not be presumed to act with criminal intent" [unless the jury so finds from the evidence]. We conclude that this instruction would not unconstitutionally mislead the jury as to the prosecution's burden of proof.

## VI. JURY INSTRUCTIONS ON VOLUNTARINESS OF THE CONFESSIONS

■ Appellant contends that the signed confession given to police officers was not voluntary and that the jury should have been instructed to determine voluntariness before considering this evidence. The trial court held a *Jackson v. Denno* hearing and admitted the confession into evidence after concluding that the appellant had voluntarily waived his fifth amendment rights. Appellant's trial counsel never requested a

specific jury instruction on confessions. The failure to make such a charge, in the absence of a timely request, is not constitutional error. *United States v. Groce,* 682 F.2d 1359, 1366 (11th Cir.1982); *United States v. Maher,* 645 F.2d 780, 783 (9th Cir.1981); *United States v. Fera,* 616 F.2d 590, 595 (1st Cir.1980), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *United States v. Lewis,* 565 F.2d 1248, 1253 (2d Cir.1977), *cert. denied,* 435 U.S. 973, 98 S.Ct. 1618, 56 L.Ed.2d 66 (1978).

## VII. SHOULD THE DISTRICT COURT HAVE HELD AN EVIDENTIARY HEARING

■ Finally, appellant asserts he was entitled to an evidentiary hearing on this habeas petition in the district court. This issue is moot because we have granted relief for the alleged errors in the sentencing procedure. The issues involving the jury instructions at the culpability phase of the trial are matters of law for which an evidentiary hearing is unnecessary.

## VIII. CONCLUSION

Because the prosecutor's argument during closing argument in the sentencing phase of appellant's trial was improper and prejudicial we vacate appellant's two death sentences and remand this case for a new sentencing trial. The verdict of guilt is not disturbed by our decision.

REVERSED IN PART and REMANDED for new sentencing hearing.

### ON PETITION FOR REHEARING AND PETITION FOR RE-HEARING EN BANC

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

BY THE COURT:

A member of this Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this Court in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by this Court en banc *with* oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of en banc briefs.